## WILLIAMS v. THE STATE.

1. There was an exchange of abusive words, resulting in the drawing of a knife by the deceased and "hot blood" in both the deceased and the accused; an interval of two hours occurred, and then a fatal rencounter ensued. It was proper in such a case for the court to charge the law of voluntary manslaughter.

   (a) The sufficiency of the interval between the causal combat and the fatal rencounter for "cooling time," was a question for the jury, to be determined in the light of all the attendant circumstances.

   (b) There was sufficient evidence to justify the charge of voluntary manslaughter, on the theory of mutual combat.

2. There was no evidence that the defendant made the first assault at the fatal rencounter. On the contrary, the deceased made the first. It was erroneous, therefore, for the court to charge: "If you believe from the evidence that the defendant made the first assault,. then, before he could be justified, not only must such absolute necessity for killing the deceased exist, but it would have to appear also that the defendant really and in good faith endeavored to decline any further struggle before the fatal shot was fired."

3. It is the better practice in a criminal case not to charge the law of preponderance of evidence, but, under the facts of this case, to do so does not require a reversal of the judgment of the trial court.

4. Whether or not the rulings complained of in the remaining grounds of the motion for new trial are in all respects accurate and perfectly adjusted to the facts in the case, they contain no such error as under the facts would require a reversal for the reasons alleged in the motion.

Submitted March 20,—Decided May 14, 1906.

Conviction of manslaughter. Before Judge Martin. Irwin superior court. January 26, 1906.

The defendant was indicted for murder, and convicted of voluntary manslaughter. He moved for a new trial upon the ground that the verdict was contrary to the evidence, law, etc.; and, by amendment, added the following, among other grounds: (1) The court erred in charging to the jury the law of voluntary manslaughter, based on the theory of irresistible passion; because the evidence did not warrant the charge. (2) The court erred in charging the law of voluntary manslaughter, based upon the theory of mutual combat; because the evidence did not warrant the charge. (3) The court erred in charging: "If you believe from the evidence that the defendant made the first assault, then, before he could be justified, not only must such absolute necessity for killing the deceased exist, but it would have to appear also that the defendant really and in good faith endeavored to decline any further struggle before the

fatal shot was fired;" because the evidence did not authorize the charge. (11.) The court erred in charging on the law as to the preponderance of evidence; because it was not applicable to a criminal case. The motion was overruled, and the defendant excepted.

*T. R. Perry* and *E. Wall,* for plaintiff in error.

*E. D. Graham, solicitor-general,* contra.

ATKINSON, J. 1. The court, while charging the jury, gave instructions upon the law of voluntary manslaughter. The defendant excepted to that part of the charge, assigning error thereon, and contending that under the evidence the law of voluntary manslaughter was not involved. It is shown by the evidence that the deceased and the defendant, while at the residence of Mr. and Mrs. Stone and in their presence, at about 4 o'clock in the afternoon of July 5, had an altercation wherein profane and abusive personal references were freely exchanged. During the progress of this altercation the defendant jumped up and down several times "in the face of the deceased;" whereupon the deceased, saying to the defendant, "You can not scare me," drew his knife. At this time Mr. Stone interfered and pushed the men apart, and apparently pacified them. After this there was some further quarrel, but no further attempt by either to do any violence to the other. The defendant, before leaving the Stone residence, made a threat to kill the deceased, but the threat does not appear to have been communicated to the deceased. However, as the defendant was leaving for his place of employment some three quarters of a mile away, for the purpose, as he said, of feeding the mules, he kept looking back, while the deceased stood in the yard watching him. After he was gone the deceased made the following threat: "That — scoundrel may be gone for something to shoot me with, for all I know; and if that is the game he wants to play, two can play it." This threat, however, does not appear to have been communicated to the defendant. After making the threat just referred to, the deceased went off to a neighbor's and got a pistol, and came back to the Stone residence. Within about 30 minutes after his return, the defendant was seen by Mrs. Stone, coming in a run along a road which passed, first, a certain commissary, and then the Stone residence. He had a gun in his hand, "just toting it." Before reaching the commissary he stopped running, and was coming in his

usual walk, with his gun still down in his hand.    Upon reaching the
commissary he was ordered by the deceased to stop, and warned that
if he passed the commissary, he (deceased) would hurt him.    The
defendant did not stop, and, so far as the witness could see, made no
reply and made no attempt to shoot at the deceased, but kept com-
ing on, and the deceased fired upon the defendant, who at that time
had his gun "up in his hand."    The fire was returned by the de-
fendant, and afterwards there was rapid firing by both parties.    The
defendant in his statement admitted the quarreling during the early
afternoon, and said that, had Mr. and Mrs. Stone not been present
to prevent it, the deceased at that time would have killed him with
his knife.    He further said, that he had obtained the gun for an
innocent purpose; that he was not intending to stop at the Stone
residence, and was not expecting any assault by the deceased; that
he did not shoot until after he had been assaulted with a pistol, and
that then he shot to save his own life.    The jury had the right to
conclude that the drawing of the knife by the deceased, during the
quarrel at the residence of Mr. and Mrs. Stone in the early after-
noon, was an assault upon the accused; that the assault being ac-
companied by language of abuse would have been sufficient, if the
killing had immediately ensued, to have authorized a conclusion that
the killing by defendant was done upon the sudden, violent impulse
of passion supposed to be irresistible.    What transpired at that time
was sufficient, had the killing immediately ensued, to have brought
the case within the rulings in *Kimball* v. *State*, 112 *Ga.* 541, *Mc-
Duffie* v. *State,* 90 *Ga.* 786, and *Jenkins* v. *State,* 123 *Ga.* 523.
There was in this case a "mutual combat" and resulting "hot
blood."    But there was an interval of some two hours between the
difficulty just referred to and the fatal shot.    What effect would this
"cooling time" have upon the case?    By express provision of the
act of 1899 (Acts 1899, p. 41; Van Epps' Code Supp. § 6743), the
sufficiency of the interval for cooling time is exclusively a question
for the jury.    After a difficulty is once shown which would justify
the charge of voluntary manslaughter, and it is shown that the
killing of deceased by defendant a few hours thereafter was the
culmination of the same difficulty, it would not, on account of in-
tervening time, be erroneous for the court to charge on the sub-
ject of voluntary manslaughter.    The sufficiency of the interval for
cooling time was a question for the jury.    It was, therefore, proper

for the court to charge the law on the subject, and leave it to the jury to say, among other things, whether or not there was irresistible passion upon the part of the accused, and whether or not there was sufficient time for the voice of reason and humanity to be heard, and whether or not the defendant, when the fatal shot was fired, was in fact laboring under the influence of that sudden, violent impulse of passion resulting from the difficulty, and supposed to be irresistible.    What is said with reference to "cooling time," under the act of 1899, is also reasonably referable to cooling circumstances, because the one necessarily involves the other.    Cooling time, in the very nature of things, must vary and be governed by the circumstances in each case.    Therefore it was right for the jury to consider all of the conduct of the defendant from the time of the first difficulty until the fatal rencounter, and construe that conduct in the light of all of the attendant circumstances and conditions, with a view of ascertaining what impulses, motives, or passions influenced him.    In this view, they were authorized to regard the threat to kill the deceased, which the defendant made before leaving the Stone residence, though the same was not communicated to the deceased.    The tendency of that threat would be to indicate that the defendant was still wrought up by the wrong which he thought had been done him.    With this in his breast he left the Stone residence, and his continued looking back at the deceased may be treated as a circumstance indicating his feeling.    The deceased was at the Stone residence when the defendant left.    After getting his gun, he returned in a *run* along the road which passes the Stone residence, the place where he had left the deceased.    The fact of his running might be considered as a circumstance indicating excitement.    The defendant may have labored with his passions and kept them under control while at the Stone residence, but the matter may not have entirely left his breast, and his feelings may not have resumed their normal sway.    It is likely that after leaving the place he brooded over the matter, and with the advance of his brooding his passion may have been aroused to the extent of becoming uncontrollable, and in that frame of mind he may have procured the gun and returned to the place where he last saw the deceased, for the purpose of killing, and as he ran the impulse may have quickened and remained irresistible until the homicide was accomplished.    All of these facts were for the jury.    A comparison of the facts in this

case with those in *McDuffie's* case, supra, shows the cases to be scarcely distinguishable, except as to the length of time between the difficulty which resulted in "hot blood" and the fatal rencounter. After that case was decided, the act of 1899 was passed, which made it obligatory upon the court to leave the matter of cooling time to the jury. It is unnecessary to go into a discussion of the evidence upon the theory of mutual combat, but we hold that there was sufficient evidence to authorize the court to submit that theory to the jury. We do not mean to say that the theory of voluntary manslaughter, under either principle, is more plausible as applied to this case than that of murder or self-defense, or of shooting under the fears of a reasonable man. . All that we do hold is that there was sufficient evidence to authorize the court to charge upon the law of voluntary manslaughter.

2. The charge complained of in the 3d ground of the amended motion for new trial is erroneous. There was no evidence that would have justified the jury in believing the defendant made the first assault. The deceased having made the first assault by firing at the defendant, who up to that time had not attempted to do any violence to the deceased, it was not necessary that the defendant should make it appear that he "really and in good faith endeavored to decline any further struggle before the fatal shot was fired." Indeed, under the evidence, that part of the charge just quoted is not applicable, and is entitled to no place in the record.

3. Complaint is made that the court charged on the subject of preponderance of evidence. In a criminal case the State is required to prove the guilt of the accused beyond a reasonable doubt. It is not good practice, in discussing the weight of evidence necessary to convict, to charge the jury in regard to preponderance of evidence applicable in civil cases; and it is better to omit any reference to that rule, where no issue is involved to which it is applicable. But in this case the only evidence introduced was on behalf of the State, and, in his general charge, the court clearly instructed the jury that they could not convict the accused unless he was proved guilty beyond a reasonable doubt; and the charge in regard to preponderance of evidence will not necessitate a reversal. *Jackson* v. *State,* ante, 101.     *Judgment reversed. All the Justices concur.*