### 3568.   BROWN *v.* THE STATE.

1. On the trial of an indictment for murder, where the offense of voluntary manslaughter is reasonably deducible from the evidence or the defendant's statement to the jury, considered separately or together, a charge on the law of voluntary manslaughter, and a verdict for that offense, were authorized.    *Cain* v. *State,* 7 *Ga. App.* 24 (65 S. E. 1069); *Pyle* v. *State,* 4 *Ga. App.* 811 (62 S. E. 540); *Bell* v. *State,* 130 *Ga.* 865 (61 S. E. 996); *Strickland* v. *State,* 133 *Ga.* 76 (65 S. E. 148).
2. The credibility of a witness is exclusively for determination by the jury, and, although a witness may have been successfully impeached, it is left to the discretion of the jury to decide whether his testimony has been corroborated; and, while it would be their duty to disregard entirely the testimony of an impeached witness, unless corroborated, yet they have the right to believe the evidence of a witness, notwithstanding the impeachment, and in the absence of any corroboration.    Section 5884 of the Civil Code (1910) is not intended as an abridgment of the absolute right of the jury to determine as to the credibility of witnesses.
3. The right of a parent to protect and defend his minor daughter from seduction or debauchery exists under the law of the State without other qualification than that stated in the statute, to wit, that the act of the parent must be one of *protection* or *defense* against *intended* or *progressing* wrong, and not in punishment or revenge for a past injury.    A charge to this effect was applicable to the facts of this case.
4. The excerpts from the charge embraced in the sixth and seventh grounds of the motion for a new trial correctly state the law as repeatedly decided by the Supreme Court, and were pertinent and applicable to the evidence.
5. The right of the accused to make to the jury a statement in his defense is strictly a personal privilege, granted by the statute, and, whether written or oral, the statement must be read or spoken by the accused, and not by his attorney.

DECIDED NOVEMBER 7, 1911.

Conviction of voluntary manslaughter; from Pulaski superior court—Judge Martin.    June 16, 1911.

*Herbert L. Grice, H. E. Coates, W. L. & Warren Grice,* for plaintiff in error.

*E. D. Graham, solicitor-general,* contra.

HILL, C. J.   Brown was indicted for murder, and was convicted of voluntary manslaughter.   His motion for a new trial having been overruled, the case is here for review.   In addition to the usual general grounds, the motion for a new trial contains the following assignments of error:

(1)   Under the evidence the killing was either murder or justifiable homicide, and the verdict of manslaughter is contrary to law.

(2)   The evidence of only one witness proved the guilt of the accused, and, this witness having been successfully impeached in several material particulars, and the evidence of this one witness not having been corroborated in any material particular, as required by section 5884 of the Civil Code (1910), there was no credible evidence to support the verdict.

(3)   The evidence did not authorize a charge on the law of voluntary manslaughter.

(4)   The court charged, without qualification or explanation, that parents and children may mutually protect each other, and there was no evidence to support such charge.

(5)   The court charged that "a parent may protect his minor daughter from debauchery to the same extent that a husband would be allowed to defend and protect the chastity and virtue of his wife."   This was error, for the reason that the evidence did not show that the deceased was engaged in protecting either his wife or his daughter from debauchery.

(6)   The court charged: "So, if the deceased, Nelson Spivey, assaulted the defendant on the ground that the defendant was committing a sexual act with the daughter of Nelson Spivey, if this was being done, it would be justifiable; but [for] what was done in the past, and to avenge such conduct after its occurrence, the deceased, Nelson Spivey, would not have a right under the law to make the assault and attack upon the defendant, and the defendant would not be deprived of his right of self-defense to resist and repel the assault."   There was no evidence of the hypothetical recital in this charge, and it was calculated to injure the defense.

(7)   On this subject the court further charged: "That is to say, in the case now on trial, before Nelson Spivey would have been authorized to make an attack upon the defendant, it must appear from the evidence that the defendant and the daughter of Nelson Spivey were then in the act of having sexual intercourse, or that the situation was such at that particular time that, as a reasonable man, Nelson Spivey could not tell whether it was just over, or just about to begin.   Under these conditions, a party would have a right to make an assault, even to taking life, and the party against whom the assault was made would not have the right to resist him, even by taking his life."   Error because this statement, without qualification, is not the law of Georgia; and also because there was no evidence to justify the charge, and it was calculated to injure the defendant before the jury.

(8)   The court charged the jury on the subject of the impeachment of witnesses by proof of contradictory statements, not made under oath, and by proof of bad character, and the weight to be given the testimony of such witnesses, when there had been no attempt by either side to impeach any witness by either of these methods.   This was calculated to confuse the jury in weighing the evidence of Della Spivey, a witness for the State, who, as movant insists, had been impeached by proof of perjury, and there was no evidence to justify this charge.

(9)   At the conclusion of the evidence, the accused stated that his statement to the jury, made on the previous trial, had been written out by the official stenographer, and he desired to make the same statement on the present trial, and his attorney would read it for him.   The solicitor-general admitted that the statement proposed to be read was the one which the accused had made at the previous trial, but objected to counsel's reading it.   The court sustained the objection, and said to the accused that he could go on the stand and make to the jury just such statement as he saw fit, and the accused did so.   It is insisted that this ruling was error, because it deprived the accused of the right, given him by law, "to make to the court and jury such statement in the case as he may deem proper in his defense."

The evidence, substantially stated, is as follows:   On the night of the homicide, Nelson Spivey was at home with his wife and several children.   About 7 o'clock, a little son came into the room,

and told his father that "Della is over yonder in, that house with Bill. " Della was a daughter, about 17 years old, and Bill was the accused. The house referred to was a vacant house in a field nearly a quarter of a mile from the home of the deceased. Immediately on getting this information, the decedent took his whip and went out. In 10 or 15 minutes, a shot was heard coming from the direction of the vacant house. Members of the family went towards the house in a few minutes, and found the body lying in a path going by the vacant house, and about 30 feet away from the door. He had been killed by a bullet through the breast.

The girl Della testified, that she and Bill (the accused) were sitting on the floor in the vacant house alone, engaged in conversation, when her father suddenly appeared in the door; that she jumped up and ran out by her father, and had gone some little distance, when she heard the report of a gun in the direction of the house from which she had run; that she saw a pistol in the pocket of the accused while they were sitting on the floor talking; that neither her father nor the accused spoke while she was present, and she noticed nothing in her father's hand when he appeared. She did not know what occurred between the two after she ran away and just previous to the fatal shot. She testified that the accused and herself had not been guilty of any immoral conduct, and were not in the house for that purpose. On cross-examination, she testified that, while she did not remember the details of her testimony on the previous trial, the account she then gave of the occurrence just before the homicide was not the truth; that she was then "scared," as she had never before been in a court-house, but that now "I am trying to tell this thing like it was." It may be here stated that the only material conflict in her evidence on this trial and the previous one was as to the place where the accused and herself were talking when they were interrupted by the sudden appearance of her father. She then testified that they were standing in the path near the vacant house, and that a third person was present. The remainder of her evidence on both trials is substantially the same. Whatever was said or done by either the accused or the decedent at the time of the homicide is not disclosed by the evidence.

The accused, in his statement to the jury, said that he and a companion met Della in the pathway going by the vacant house;

that they stopped and spoke to her; that he was about to pass on, when she told him that she had something to tell him; and that while they were talking the decedent came up to them and asked what they were doing there, and he replied, "Nothing;" that Della ran away, and her father struck him on the head with a whip; that he "broke and ran," and the decedent pursued him, striking him repeatedly with the whip. "I fell, and he wore his whip out on me, so he could not use it; broke it up. He run his hand in his pocket and got out his knife, and opened it with his teeth, and, as he got it open, I shot him. That is just the way it was."

Two witnesses in behalf of the accused testified, that the body of the decedent was found about 30 or 40 yards from the old vacant house in the path leading by the house through the field; that about 30 yards from the house and 40 yards from where the body was found the appearance of the ground indicated that a struggle had taken place; that a broken whip was on the ground by the body, and an open knife was in the left hand of the decedent. No powder stains were found on the clothing of the decedent.

Several of the grounds of the motion for a new trial relate to the same subject, and we will group them and decide the questions raised, in the light of the evidence.

1. Could the jury reasonably deduce from the evidence and the statement of the accused the crime of voluntary manslaughter? The evidence alone does not clearly show the grade of the offense; indeed, it does not conclusively prove any offense. The killing by the accused is reasonably inferable from all the circumstances, but what immediately preceded the killing, or what caused it, is more or less a matter of speculation, so far as the evidence discloses. The only witness for the State saw the pistol in the pocket of the accused. She saw her father enter the door, but did not see any weapon in his possession. She immediately fled, and, when some distance from the scene, heard the report of the pistol. The struggle between the two men took place outside the house. The condition of the ground, and the broken whip, the open knife, the bullet in the breast of the deceased, proved a struggle. The particulars of this struggle must be left to conjecture, except as stated to the jury by the accused. This statement had such force only as the jury might think it right to give it. Penal Code (1910), § 1036. They had the exclusive right to reject it altogether, or accept it altogether, to believe it in part, or disbelieve it in part.

In the exercise of this unlimited discretion, they chose to accept as the truth that part of the statement which authorized the verdict of voluntary manslaughter. They accepted the statement of the accused that the decedent was striking him with the whip. They rejected the statement that the accused did not shoot until the decedent drew his knife and opened it with his teeth, and was about to cut him. They probably rejected entirely the statement relating to the knife. There were circumstances that indicated that the knife defense was fabricated. The knife was not found by those who first reached the dead man. Its appearance was coincident with the appearance of the friends of the accused. It was found opened in the open left hand of the decedent, and no powder-burn or stain was found upon the clothing of the decedent. The jury doubtless thought that the whipping was not an attempt to commit a felony, and therefore the killing was not justifiable, but was an assault sufficient to arouse the excitement of passion and to reduce the crime to manslaughter. If they had concluded that the whipping by the outraged parent, of the man who was apparently intending to debauch his young daughter, was fully warranted, and that the accused had no rights under the law, this court would have approved. If they had thought that the attempted seducer of the daughter should have submitted to the just chastisement inflicted by the angry father, and, without violent resistance, "writhed in grace and groaned in melody," keeping time to the crack of the whip, and that the killing of the father by the wrong-doer was murder, the finding would have been in accord with law and justice. The verdict of voluntary manslaughter was not only fully warranted by the circumstances, and that portion of the statement of the accused which the jury believed, but was largely tempered by mercy.

2. (Second and eighth grounds.) The evidence of the girl, Della Spivey, was immaterial and irrelevant as relating to the verdict of manslaughter. As above suggested, what she testified on this trial, or on the first trial, did not present any theory upon which the grade of the homicide could have been satisfactorily determined. But the credibility of the testimony was entirely for the jury. It was for them to decide whether she was telling the truth on this or on the former trial. Suppose the jury believed her statement that she was "scared" when she testified on the pre-

vious trial, but was now telling the truth, would they not have had the right to do so? While section 5884 of the Civil Code (1910) declares that, "if a witness swear wilfully and knowingly falsely, his testimony ought to be disregarded entirely, unless corroborated by circumstances, or other unimpeached evidence," yet the jury may credit even an impeached witness without any corroboration. The whole question of the credibility of witnesses is wisely left to the jury under any and all circumstances, and, though Ananias and Sapphira spoke again, the law would not strike them dead, but would leave their testimony to be weighed and accepted or rejected by the jury. In this case there were circumstances of corroboration.

3. It is said in the fourth and fifth grounds of the motion for a new trial that the court erred in charging, without qualification or explanation, that "parents and children may mutually protect each other, and justify the defense of the person or reputation of each other;" and also that there was no evidence to justify the charge. This excerpt is in the exact language of the statute. Penal Code (1910), § 74. We are not aware of any qualification of this mutual right, except that stated in the statute, that the act must be in "protection" or in "defense;" and certainly the statement of this right with the statutory qualification needs no other explanation. We think, also, that the facts fully justified the instruction. If the time ever comes when a father would be authorized to protect and defend his child of tender years, both in her person and her reputation, from the machinations of the wicked, it would be when she was absent from home at night in a vacant house, alone with a man armed to prevent interference, and with evil and criminal intent. Under such circumstances, it would be the duty of the parent to protect his child against her own evil inclinations, and to defend her from the wicked designs of the man.

4. The sixth and seventh grounds of the motion for new trial object to excerpts from the charge where the judge applies concretely to the facts of this case the general principle that a father would have the right to protect and defend his daughter from intended debauchery. These excerpts state the law as construed and declared by the Supreme Court in many decisions, notably in *Hill* v. *State,* 64 *Ga.* 453; *Gossett* v. *State,* 123 *Ga.* 431 (51 S. E. 394); *Drysdale* v. *State,* 83 *Ga.* 744 (10 S. E. 358, 6 L. R. A. 424,

20 Am. St. R. 340) ; *Wilkerson* v. *State,* 91 *Ga.* 734 (17 S. E. 990, 44 Am. St. R. 63) ; *O'Shields* v. *State,* 125 *Ga.* 310 (54 S. E. 120) ; *Mize* v. *State,* 135 *Ga.* 291 (69 S. E. 173). It is insisted, however, that the principle of law which entitles a parent to protect and defend his minor daughter from an intended or progressing wrong of debauchery, and, under such circumstances deprives the wrong-doer of his right of defense, was not applicable to the evidence; that if the accused was guilty of the criminal act of fornication with the minor daughter, it was over before the father appeared on the scene, and that the assault which the father made on the accused was not in protection or defense, but in punishment of a past wrong, and therefore the accused had a right to defend himself from the assault and attack of the father. In *Drysdale* v. *State,* supra, it is held that "a husband may attack for intimacy with his wife in his presence, raising a well-founded belief that the criminal act ' is just over, or about to begin,' and the adulterer, though in danger, has no right to defend himself by using a deadly weapon. " In *O'Shields* v. *State,* supra, the expression, " just over, or about to begin," was construed to refer to a state of facts and circumstances which left doubtful in the mind of the husband the stage of the proceedings which his arrival interrupted. The facts and circumstances of this case proved very clearly that a criminal act had been committed or was intended. Whether it was "just over, or about to begin," was not so clear; but the circumstances were surely sufficient to justify in the mind of the father a doubt as to the "stage of the proceedings his arrival interrupted." Where a father finds his 17-year-old daughter in a vacant house alone at night, away from any near-by habitation, in company with a man fully armed for any emergency, and she immediately flees from the scene, we think the law would be very lenient with the father, and readily give him the benefit of any doubt that the incriminatory circumstances might raise in his troubled and outraged mind. We think the facts and circumstances authorized the trial judge to charge the principle laid down in the *Drysdale* case, supra, as interpreted in the *O'Shields* case, supra.

It is insisted that the trial judge, in this connection, committed the same error for which the Supreme Court granted another trial in *Brown* v. *State,* 135 *Ga.* 656 (70 S. E. 329). There are two reasons why this contention is not sound: First, the evidence

in this record is substantially different from the evidence on the former trial. Here the minor daughter was found under the circumstances narrated above, with the accused, in an old vacant house, some distance from any other habitation, and the circumstances left in doubt the question whether the act of debauchery was "just over, or about to begin." According to the evidence on the former trial, the girl was found in the road, talking to the accused, and a third person was nearby, and there could have been no doubt that if any immoral act had been committed it was completed before the decedent appeared on the scene; for the only inference deducible from the evidence on the first trial was that the immoral act, if it occurred, took place before the accused and the girl left the old house, and the homicide took place in the road near the old house. The second reply to this contention is that the jury in the first trial deprived the accused entirely of his right of self-defense, and found him guilty of murder. On this trial, while they concluded that he was not entirely justifiable in defending himself from the attack of the father, they yet reduced his offense to manslaughter, because of such attack.

5: The right given by the statute to the accused "to make to the court and jury such statement in the case as he may deem proper in his defense" is strictly a personal right. He can write it out and read it to the jury, or he can make it orally; but he must read it or speak it. He can not delegate this act to his attorney. There are several reasons why it might in some instances' defeat the ends of justice, by misleading the jury as to the truth, if the statement of the accused could be read by his attorney. The arts of expression frequently give undue weight to words. It is said of the great preacher, Whitefield, that he could thrill an audience by a most insignificant word. Even his interjections, his "Ah!" of pity, and his "Oh!" of appeal to the sinner, were words of tremendous power, and formed a most effective weapon in his pulpit artillery. The actor, Garrick, himself a marvelous master of expression, said that he would "give a hundred guineas if he could utter the word 'Oh!' as Whitefield did." And so an eloquent attorney, by potent elocution and a trick of emphasis, when speaking as the accused, might in some cases, by the mere utterance of the words, "Gentlemen of the jury, before God I protest my innocence," mislead them into thinking that he

was really speaking the truth. And, on the other hand, the hesitating manner of one on trial, caused by consciousness of guilt, sometimes of itself would indicate to the jury the truth. The statute, however, is so explicit that it is hardly necessary to give any reason in support of the opinion here expressed. There was no error in refusing to allow the attorney for the accused to read his statement to the jury, although he avouched it as in truth his statement, and although it was admitted that, at the previous trial, he made the statement proposed to be read by his attorney, and that it was correctly taken down and written out by the official stenographer. The accused was not deprived of his right by this ruling. The judge informed him of his right, and he availed himself of it.

We have given to this case most careful consideration, and are satisfied that no error was committed, and that the verdict was as favorable to the accused as, under the law and the evidence, he had the right to expect.                    *Judgment affirmed.*