## PLYMEL *v.* THE STATE.

ATKINSON, J. 1. On the trial of a person charged with murder, where the evidence shows that the defendant killed the deceased as alleged in the indictment by shooting him with a pistol, evidence that the defendant shot the deceased because "he was coming on to him with his knife," in connection with other evidence that deceased approached to

---

Criminal Law, 16 C. J. p. 968, n. 95; p. 1036, n. 58; p. 1040, n. 88; p. 1047, n. 65; p. 1050, n. 84; 17 C. J. p. 203, n. 85, 87; p. 345, n. 41.

Homicide, 29 C. J. p. 1123, n. 41; p. 1135, n. 77; 30 C. J. p. 36, n. 94 New; p. 364, n. 83; p. 365, n. 85; p. 367, n. 11; p. 380, n. 91; p. 406, n. 17; p. 407, n. 21; p. 411, n. 52; p. 418, n. 1; p. 449, n. 79; p. 451, n. 20.

within striking distance when the shot was fired, was sufficient to authorize a charge upon the subject of voluntary manslaughter, on the basis of passion produced by an assault, as ruled in *Williams* v. *State,* 125 *Ga.* 302 (54 S. E. 108), and cit., and *Brown* v. *State,* 144 *Ga.* 216 (87 S. E. 4).

2. On the trial of a case of the character just indicated, the defendant in his statement before the jury said in effect that on the day of the homicide and within one or two hours before its commission he had been informed that the deceased had circulated a report that he was in the habit of having adulterous intercourse with the wife of the defendant whenever he desired, and it was doubtful whether her youngest child was his or the defendant's; and that when called upon to face the persons who had informed the defendant about the circulation of the report, the deceased stated to the defendant "You have been talking and telling damn lies on me, too, and I am damn tired of it," and "started on" the defendant with a knife, and the defendant fired the fatal shot when he saw that the deceased "meant to hurt" him. *Held:*

(*a*) The circulation of the report attributed to the deceased in the defendant's statement before the jury was not sufficient to authorize a charge upon the subject of voluntary manslaughter, under the principle ruled in *Richardson* v. *State,* 70 *Ga.* 825 (2), relating to passion based on discovery of debauchery of the defendant's wife, followed in *Patterson* v. *State,* 134 *Ga.* 264 (2) (67 S. E. 816).

(*b*) The recitals of fact by the defendant differ from those involved in the cases of *Richardson* v. *State,* and *Patterson* v. *State,* supra, which did not relate to the mere circulation of a report.

(*c*) The language in the defendant's statement attributed to the deceased, "You have been talking and telling damn lies on me too, and I am damn tired of it," and in connection therewith the facts as stated by the defendant that the deceased "started on me with a knife," and defendant shot because he saw that the deceasd "meant to hurt" him, were sufficient to authorize a charge on the subject of voluntary manslaughter, under the principle stated in the first division of this decision.

3. Complaint is made, in the motion for a new trial, of an instruction by the court as to the form of the verdict, wherein the jury were told that only three forms of verdict could be returned: (1) Finding the defendant "guilty," which without more would carry the penalty of death. (2) A verdict of guilty, with recommendation to the mercy of the court, which would carry punishment by confinement in the penitentiary for life. (3) A verdict of not guilty. The complaint is that this instruction eliminated from the consideration of the jury the question of voluntary manslaughter, and that the judge nowhere instructed the jury as to the form or effect of a verdict finding the defendant guilty of voluntary manslaughter, although he gave in charge to the jury the sections of the code relating to the subject of voluntary manslaughter. *Held:* As it has been ruled above that voluntary manslaughter was involved in this case, it was error to instruct the jury, relatively to the form of the verdict, as above indicated, because the effect of the charge was to eliminate the defense of voluntary manslaughter.

4. The judge read to the jury section 65 of the Penal Code. Complaint

is made of giving the following part of the section: "Provocation by words, threats, menaces, or contemptuous gestures shall in no case free the person killing from the guilt and crime of murder." The ground of complaint is that the judge did not charge further, or at least call the attention of the jury to the fact, that "while words, threats, menaces, or contemptuous gestures will not mitigate the offense, . . nevertheless, words, threats, menaces, or contemptuous gestures may justify a killing, if the circumstances be such as reasonably to arouse the fears of a reasonable man that a felony or serious personal injury is about to be committed upon him." There is no merit in this criticism. The judge was charging only upon voluntary manslaughter, and not upon the subject of justifiable homicide as based on the doctrine of reasonable fears. The matters of voluntary manslaughter and justifiable homicide are separate and distinct, and it is permissible under the statute to give in charge the language excepted to in this case while instructing the jury upon the subject of voluntary manslaughter. This was stated in *Clay* v. *State*, 124 *Ga.* 795 (53 S. E. 179). In a subsequent portion of the charge the judge charged appropriately on the subject of justifiable homicide as related to the doctrine of reasonable fears.

5. Another ground of the motion for new trial complains because, after giving the definition of murder as contained in section 60 of the Penal Code, the judge in a subsequent part of the charge again defined murder. The criticism was that repetition of the charge tended to unduly impress on the jury "the law of murder," and amounted to an expression of an opinion that "the accused was guilty of murder," and indicated to the jury that the court "believed the defendant guilty and wanted him convicted." The charge was not erroneous for the reason assigned.

6. Another ground complains because, after defining justifiable homicide and charging upon the subject of fears as indicated above, the judge in a subsequent portion of the charge repeated the instruction employing the exact language in each instance. The ground of criticism was that repetition of the charge tended to impress upon the minds of the jurors that the homicide in this case was committed under a "bare fear," and amounted to an expression of opinion by the court upon that subject. The charge was not erroneous for the reason assigned.

7. As the case will be remitted to the trial court for another trial, no ruling will be made on the sufficiency of the evidence to support the verdict.                     *Judgment reversed. All the Justices concur.*

No. 5739.    SEPTEMBER 8, 1927.

Murder. Before Judge Knight. Berrien superior court. September 12, 1926.

On an indictment charging Mallie Plymel with the murder of Roan Pafford by shooting him with a pistol, the jury returned a verdict finding the defendant guilty, and did not recommend him to the mercy of the court. The defendant's motion for a new trial was overruled, and he excepted. The State's evidence tended to show that the homicide occurred at the home of Pafford, "about

sundown" on a stated Sunday afternoon; that during the afternoon, a short while before the homicide, the defendant threatened to kill Pafford if he did not pay him a debt; that the threat was communicated to Pafford, who "said he wouldn't do it, and asked if Mallie was drinking," to which question the informant replied that he "thought he was, from the way he was acting." A few minutes later the defendant appeared at the lot of Pafford and found him feeding his mules. A witness for the State, who was the person who communicated the threat, thus described what then took place: "Mallie [defendant] spoke, and we spoke to him, and Mallie asked him how his tobacco was getting along, and Roan [the deceased] told him 'fine,' and said, 'How is yours?' and Mallie says, 'Getting along alright, I reckon,' and Mallie asked for a cigarette, and Roan give him one, and they struck a match and both lit from the same match. They then stood there a little bit, and Mallie asked him to go down the road with him, and Roan told him he would have to stay there and tend to the things. Mallie told him to 'just come on out here and lets walk down to the road,' and he asked him again, and Roan wouldn't go, and Mallie was standing with his hands in his pocket, and just took out his pistol and shot him. Roan didn't do anything to Mallie; he didn't attempt to do anything; he didn't make any movement to strike him; he didn't have any weapon. We was standing about a yard apart, all three of us; he shot him with a .32 Lemon Squeezer, and hit him right under the heart. Roan staggered back, like he was going to fall, six or eight feet, and got straightened up and turned towards the house when Mallie shot again; he was just getting straightened up to go to the house; he didn't hit him the second time. Roan climbed the fence and fell on the porch. . . There wasn't anything said about any trouble when Mallie came up there." Pafford's wife and two small children were on the porch at the time. Mrs. Pafford testified as a witness, but the children were too young to testify. The testimony of Mrs. Pafford described the homicide substantially as stated above; and stated further that when Pafford pulled down his overalls to show where he was shot, his pocket-knife fell out of his pocket, that the knife was unopened, and that at the time of the shooting Pafford "did not have any weapon of any kind in his hand" nor did he "make any movement of any kind toward" defendant.

Another witness for the State testified that about two hours before the homicide the defendant stated to him: "That Roan Pafford had stole some whisky from him, and he was either going to have him to pay for the whisky or get the whisky back, or he was going to kill him." The witness did not see defendant any more until after the shooting took place, but immediately after the shooting and at a place about a quarter of a mile distant from the scene of the homicide the defendant told him "that he had killed Roan Pafford down there, and he wanted me to go see about him; he told me why he killed him; he said he was coming on to him with his knife." About 24 hours after the shooting Pafford died. In a dying declaration he stated that he and the defendant had not had any trouble, and "that Mallie had accused him of stealing some whisky, and . . if it wasn't for that he didn't know what the trouble was about." The defendant made a statement before the jury, in which he did not refer to the whisky or threat, but stated that on the Sunday afternoon in question two of the State's witnesses came to defendant's house and asked if he had "heard the talk that Roan Pafford was making about" defendant's wife, to which he replied "I haven't." Whereupon they stated that Pafford had said that he had been having "dealings" with defendant's wife "any time he took a notion," and that it was doubtful whether her second child was his or defendant's; and that they urged defendant to go and "face him in it." Defendant refused to "go to Roan's house, for fear it might cause trouble between them," but agreed to go and face Pafford upon one of the parties promising to get him to "come down to the public road." The statement proceeded: "I thought that if he had been telling that, he was doing me wrong." After the party had gone for the purpose of bringing Pafford down to the road, defendant went in a car with others, and stopped in the road in front of Pafford's house. Defendant got out of the car and started to the house, and when he had gone about 50 yards he saw Pafford and the person who had gone for him, coming out of the lot, and Pafford said to the person with him "something . . about he would fix the damn son of a bitch," and "spoke to me, and I spoke to him friendly, just like always, and I said, . . 'Lets walk down to the public road.' And he said 'No, I ain't going no damn where.' I says, 'I don't want no trouble with you. I want to ask you a

question.  I just want to find out who told the wrong tale about it.' "  The defendant then stated that he repeated to Pafford the above-mentioned communications as to statements by Pafford relating to "dealings" with defendant's wife and the paternity of her child, and that he wanted Pafford to "face" the person who told him about it; whereupon Pafford said:  "You have been talking and telling damn lies on me too, and I am damn tired of it, . . and started on me with the knife, and I seen he meant to hurt me, and I shot twice, and I started back towards 'the public road towards my house."  In his statement the defendant also said that after the shooting the person who had gone to bring Pafford down to the road told him that on the way from the lot to the road he had lent Pafford his knife, and that Pafford had stated to him that if "you [defendant] got to talking about your folks, that he would cut your damn head off."

*W. D. Buie* and *Jeff S. Story,* for plaintiff in error.

*George M. Napier, attorney-general, H. C. Morgan, solicitor-general, T. R. Gress, assistant attorney-general, W. A. Smith,* and *J. H. Hull,* contra.