### 24472. BOATRIGHT v. THE STATE.

DECIDED APRIL 8, 1935.

*T. J. Townsend, A. J. Tuten,* for plaintiff in error.

*A. B. Spence, solicitor-general,* contra.

MACINTYRE, J. Lonnie Boatright was indicted for committing murder by shooting Ivey Deen with a shotgun. He was convicted of the offense of voluntary manslaughter. He excepts to the judgment overruling his motion for a new trial.

It is unquestioned that the defendant shot and killed Deen on the afternoon of March 12, 1932, near a certain bridge in Bacon county. Since the contention is made, under the general grounds and one of the special grounds of the motion for a new trial, that manslaughter was not in the case, we deem it proper to indicate what the evidence was. We think that the State's version of the homicide sufficiently appears from the testimony of its witness Harley Turner, which is substantially as follows: Witness and

Deen visited the defendant's home shortly before the homicide, on a peaceful mission. Just as the defendant came home, witness and Deen were preparing to ride away on their mules. The defendant asked "had we got what we come there after." Witness replied that he was wrong, and said to him, "we did not come there for nothing, and was not expecting to carry anything away, and he went to cussing us." As witness and Deen were riding away on their mules, defendant came out of his house "in a fast walk" with a gun. He put the gun down and walked pretty close to witness and Deen, and took his knife out and kept on cursing. Seeing that they could "get no sense in" defendant, witness and Deen rode away on their mules. In a very short time the defendant and John Stewart and Delaney Troop came up behind them in an automobile, and witness rode to the right and Deen to the left to let the car pass. When the car was within about thirty feet of witness and Deen it stopped, and the defendant pointed a gun through the windshield-opening at either witness or Deen. Stewart pushed the gun down. This occurred about a mile from where the homicide occurred, and about an hour and three quarters before the killing. After witness and Deen had ridden up the road about forty yards, "that same occasion happened again." Shortly thereafter the automobile again overtook witness and Deen, and the defendant again pointed the gun towards witness and Deen, and again it was knocked down. A few minutes after witness and Deen reached "Miles Bridge, Mr. Crosby's store," the defendant came up, got out of the automobile, and began cursing again. Witness said that the defendant cursed him vilely in the presence of other people, and he offered to fight him fair if "he would lay down his gun." Witness started "a little in the direction of Lonnie," and the defendant, with an oath, pointed the gun at him and threatened to kill witness if he came a step further. The defendant also pointed his gun at several other people who, he seemed to think, were trying to get his gun. Mrs. Crosby requested Hance Harris to take the defendant away from the store, and Hance took him across the bridge. Another person tried to get witness away, but witness said he had to go home, and refused to go with him. When witness and Deen started across the bridge, the defendant was out in the road, cursing and waiving his gun around. Witness and Deen dismounted and hitched their mules. The witness then

swore: "When we got off the mules, the defendant had his gun in front of us. . . Then we went walking on up there. I was, I suppose, about five steps behind Ivey. . . Then he said, 'Stop Ivey;' and Ivey stopped and he throwed the gun out and shot him down that quick. Ivey was not walking directly to Lonnie; he was going sorter across to the car. . . Ivey was not doing anything at the time he was shot. He had one hand in his apron of his overalls, and the other hand in the lower pocket. . . The defendant . . watched me, and went around the car and cranked up and left."

In his statement to the jury the defendant substantially said, "they [apparently referring to Harley Turner and Deen] parted me and my wife," and that the defendant had requested them to stay away from his home, and that when he came upon them there, "It put a bad feeling in me;" that when defendant asked them their business and requested them to stay away from his home, he said, "I would not be run off by such a S. O. B. as you are;" and "I went into the house and picked up the gun and they left;" that as defendant and those with him approached Jack Williams, Deen and Turner "stopped and headed the mules back to the car;" that the car stopped, and "they got ahead of us and galloped down the lane;" and "we decided to get the parts to fix my car, so we went to the bridge to get the gas." The defendant then proceeded with his statement as follows: "So they were over at that little brush arbor over there, and I got out of the car, and Harley come direct to me, and Ivey cut me off from my home. I turned and . . walked down next to the bridge, and, as I did that, Omer Stewart come out of the store, and Harley Turner come around on the other side of the car and met nearly together. And then I told them not to come on me, and they did not stop at all and kept advancing on me, and I told Turner 'If you come another step, I will kill you;' and he wheeled. And by that time Hance Harris told me that they had threatened to beat my brains out, and we went across the bridge. . . When we got to the bridge, they were coming on the mules, and I kept walking and looking back. They hitched their mules and come right on to me—Harley on the left and Ivey on the right. They wanted a chance to run into me and take my gun. . . I told personally a time or two, 'Ivey don't come on me; I am not able to fight you and am not going

to fight you;' and he did not do it, and it looked to me like he jerked to run into me . . when I shot him. I had just got out of the hospital from being operated on. . . That was the condition I was in to beat those two men." The defendant made the following supplemental statement: "When I come to the house that day and found him [Deen] in the house, me and him had some words there. He dared me over the fence, and said he would beat me up when I got over the fence. He knew I had a knife— that was the only protection I had, and he turned to Harley and said: 'Harley, give me your knife and I will cut his G. D. guts out.' If I had not shot him, they would have killed me. I was not able to fight, and not able to take a beating, and I fully believed in my own mind if I had not done what I did, I would have been in my grave."

Hance Harris, sworn for the defendant, testified: "I went to Lonnie . . Mrs. Crosby asked me to take him away from the crowd. I told Lonnie: 'Lonnie, they said they are going to beat your brains out; let's go off from about here.' Lonnie turned round and walked off, and me and him walked across the bridge. I told Lonnie what Harley said, and Deen said that he would take the gun away from him. . . When we got across the bridge and stopped, we saw them coming; they were following us on over there. . . When they crossed the bridge, they got down and one hitched his mule and the other turned his loose or got somebody to hold it. . . They come right on us. . . Lonnie kept backing back and telling Ivey to stay off . . and Ivey kept coming on to him, and he shot him. Lonnie had backed something like thirty yards. . . At the time Ivey was advancing . . his right hand was in his pocket, and his left hand was in his bosom." Referring to a time immediately preceding the homicide, Oscar Jordan, sworn for the defendant, testified: "Mr. Turner says to Ivey, the fellow he was with, 'Hitch, hell, we will get him.'" There was testimony that a knife was found near Deen's hand after he fell, and that the defendant never shot until Deen was in about five feet of him. Archie Miles, sworn for the defendant, testified: "I picked Turner out of the bunch going on to him [defendant] because it looked like he was going to put Deen out in the open. . . I knew from what I heard that they were going over there for a fight."

We are satisfied that under the facts before them the jury were warranted in finding the defendant guilty of voluntary manslaughter. See, in this connection, *Williams* v. *State,* 125 *Ga.* 302; *Young* v. *State,* 10 *Ga. App.* 116. "On the trial of an indictment for murder, where the offense of voluntary manslaughter was reasonably deducible from the evidence or the defendant's statement to the jury, considered separately or together, a charge on the law of voluntary manslaughter, and a verdict for that offense, were authorized." *Brown* v. *State,* 10 *Ga. App.* 50, and cit. It follows that there is no merit in the ground of the motion for a new trial complaining that the court erred in charging the law of voluntary manslaughter.

We quote from the only other ground of the motion for a new trial, as follows: "Because the court overruled motion made by the defendant's counsel during the trial of the case after the jury was sworn, but before any evidence had been submitted in the case, as follows . . : In the selection of a jury yesterday, the name of J. E. Perkle, who is now a member on this jury to try the defendant, was put upon the accused as a juror. Mr. Perkle . . qualified under the voir dire questions. . . At that time counsel for the defendant did not have before them the indictment against Lonnie Boatright. There appears in the face of the indictment the name of J. E. Perkle as a member of the grand jury that indicted the defendant, and as foreman of the grand jury. While we realize . . that his name should have been challenged, we think, . . in all justice and fairness to the defendant, that Mr. Perkle should not act as one of the tales jurors in this case. If he acted . . in returning the indictment, he did express his opinion as to the guilt of the accused based upon testimony before the grand jury, and we ask . . that we be allowed to have the number of the other strikes for the defendant that we have not used, and that he be excused from service on the jury, and that we be allowed to get another juror to take his place." The court ruled that the juror should have been challenged before the jury was sworn, but offered to allow counsel to ask the juror any questions to determine "whether or not he is impartial." Mr. Tuten suggested: "He has already qualified on the voir dire." The court suggested that the case might be tried by eleven jurors by consent. Counsel for the defendant agreed to this, but the solicitor-general

said that the prosecution relied on its "legal rights," and would not agree that the case be tried by eleven jurors. The court ruled that "the challenge comes too late."

The affidavits of both counsel and the defendant, to show diligence, were attached to this ground as an exhibit. It appears from the affidavits of counsel that Mr. Perkle was a tales juror and they had no previous knowledge that he would serve on the jury; that they had no knowledge that he had served on the grand jury; and that "at the time the jurors were caught up, defendant or his counsel did not have the bill of indictment, but that as soon as defendant and his counsel had access to the indictment, they discovered the name of the disqualified juror on said indictment and objected to his service on the jury . . before any evidence had been submitted."

Under the constitution of this State (Civil Code of 1910, § 6361), the defendant had the right to demand a copy of the indictment, and this he never did. Even so, had counsel examined the indictment to which their client pleaded "not guilty," they could readily have ascertained that the juror was the foreman of the grand jury. The juror was put upon the voir dire, and even though he was a tales juror, an examination of the indictment, or a copy of it had one been demanded, would have disclosed that he had served upon the grand jury which found the indictment. There being ground for concluding that due diligence was not exercised in ascertaining, before the juror was accepted and the jury were sworn, that the juror had served on the grand jury which found the indictment, we hold that the trial judge did not err in overruling the motion of counsel for the plaintiff in error, and that the ground is not meritorious. See, in this connection, *Jones* v. *State,* 95 *Ga.* 497; *Cargill* v. *State,* 12 *Ga. App.* 574 (2); *Massey* v. *State,* 124 *Ga.* 24.

*Judgment affirmed.* *Broyles, C. J., and Guerry, J., concur.*