## PERRY *v.* THE STATE.

No. 12148. JANUARY 19, 1938.

*George P. Munro,* for plaintiff in error.

*M. J. Yeomans,* attorney-general, *Herbert Calhoun, W. R. Flournoy,* solicitors-general, *E. G. Arnall,* and *E. J. Clower,* contra.

ATKINSON, Presiding Justice. Arthur Perry and Arthur Mack were jointly indicted for murder of Charlie R. Helton by cutting and stabbing him with a knife or other sharp instrument to the grand jurors unknown. On separate trial of Perry the evidence tended to show the following: An industrial institution in the City of Columbus gave a barbecue at the fair grounds, to which all its employees and their families were invited. The guests assembled at 7:30 p. m., and left about one o'clock a. m. Separate places were provided for whites and blacks, the whites being assembled in the large "exhibit building," and the blacks being outside near "the other brick building," all in the same enclosure. The rencounter took place down behind the "cattle barn." Helton, an employee of the company, was placed temporarily in charge of the equipment and materials left over at the conclusion of the affair. He was also a deputized police officer and carried a pistol. He engaged Ben McMurray, whom he called "Boy," to assist him in looking after the company's property. McMurray gave the following account: "After the crowd left the fair grounds, me and Mr. Helton, Essie [Thomas], Mackie Hudson, Arthur Perry, and Arthur Mack remained there. . . I heard Mr. Helton ask

Arthur Perry and Arthur Mack . . 'Did you have enjoyment at the picnic?' They says, 'Yes, sir.' He says, 'All right.' Mr. Helton says, 'Look in that tub there and get you a bottle of beer and drink it, and you all go.' He was talking to Arthur Perry and Arthur Mack and Macie Hudson. He says, 'Get you a bottle of beer and drink it, and you all go ahead home,' and I went to the tub and got the beer myself and opened it and gave it to them, and they drank it, and he says when they got through to go home. Mr. Helton says: 'I got this boy hired down here, and he is going to stay here all night, and you all can go on home,' and two or three of them went off together. And they went right straight up the road toward the gate. A few minutes after they left, Arthur Perry and Arthur Mack came back. Arthur Perry had a dime in his hand, and he came back and said: 'Boss, I want to buy a bottle of beer.' Mr. Helton says: 'We done give you a bottle of beer, all of you. We are not selling beer,' and Mr. Helton says, 'I told you to get out of here,' . . and I walked up to Perry and caught him by his arm. . . I rushed them back up towards the gate up the road, and I come on back and set down. The lights were on then. . . Mr. Helton, he was standing over there at the end of the table, and Essie was sitting back over there, . . and Mr. Helton walked from where he was back to the switch and cut the lights off. He says, 'Boy, . . I will be back toreckly, I am going to the back end of this building,' . . and in about two minutes . . I heard him halloa down there. He says . . 'I thought I told you all to get out from here,'— bam, bam, bam, bam, bam [on cross-examination (I heard these shots fired, about five. They were quick, bam, bam, bam, bam, bam, like that as fast as you could pull a trigger. I didn't hear any fuss or squabbling before)]. 'Boy, come here, don't let them kill me, don't let them kill me.' Mr. Helton was calling me when he said 'Boy.' . . At that time I run back down there where he was, and when I got there and I seen Arthur Perry's hand go down that way, but what he had in it I don't know. Arthur Mack was lying on the ground flat on his back. Mr. Helton laying across him just like that and Arthur Perry was on top of him. I saw Arthur Perry's hand go down that way. What he done I don't know, but I seed his hand go down that way. . . I run and pushed Arthur Perry up off of Mr. Helton and asked him, I

says, 'What is you doing?' and I turned from him immediately . . and run up to Mr. Dick Wise's house. . . She [Mrs. Wise] called the officers for me. . . After I got back to Mr. Helton he says, 'Boy, get me to the doctor as quickly as you can; do something for me. Lord, I am dying. Do something for me; get me to the doctor,' and I called the officer, I says, 'Come on, help me put him in the car,' and he was too heavy for me and him to put him in the car, and he says, 'Wait until this other man comes,' and we all got him and taken him and put him in the car. . . He said that black negro had his gun. He didn't call Perry's name. He says, 'The black negro got my gun.'" Other evidence tended to show that Helton had sixteen knife wounds about the chest and some in the region of the heart, from which he died upon reaching the hospital; also that the defendant Mack was found wounded at the place from where he was carried to the hospital; also that the defendant Perry was shot through the thigh, and made a trail through the weeds and over a fence to a nearby house where he gained entrance and from which he was carried to the hospital. In his statement before the jury the defendant Perry declared his presence and the shooting of Mack and himself by Helton, but stated that when he got up and held Mack's head . . off the ground he looked up and saw "two somebodys tustling over there," and further stated: "No, sir, I hadn't touched Mr. Helton. I didn't even touch him. I didn't have no knife." The jury returned a verdict finding the defendant guilty, without any recommendation. The exception is to the overruling of the defendant's motion for a new trial.

1. If on a trial for murder the evidence tends to show that the defendant committed the homicide "in self-defense, or in defense of . . person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on" him (Code, § 26-1011), and "that the danger was so urgent and pressing at the time of the killing, that, in order to save his own life, the killing of the other was absolutely necessary, and . . that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given" (§ 26-1014), such evidence would present the defense of justifiable homicide; and it would be the duty of the

judge to give in charge to the jury the foregoing principles, even though not so requested.

2. If in such case there "be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied," and the killing is "the result of that sudden, violent impulse of passion supposed to be irresistible," and there has not "been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard," the offense would be voluntary manslaughter. Code, § 26-1007. *Williams* v. *State,* 125 *Ga.* 302 (54 S. E. 108), and cit.; *Plymel* v. *State,* 164 *Ga.* 677 (139 S. E. 349).

(*a*) In such case an assault may be found in evidence of a mutual intention to fight. *Ray* v. *State,* 15 *Ga.* 223; *Gann* v. *State,* 30 *Ga.* 67; *Findley* v. *State,* 125 *Ga.* 579 (3) (54 S. E. 106).

(*b*) Where there is evidence of voluntary manslaughter, it is the duty of the judge to give in charge to the jury the law on that subject, even without a request. *Kimball* v. *State,* 112 *Ga.* 541 (37 S. E. 886).

3. Under the testimony of McMurray, witness for the State, the issues of both justifiable homicide and voluntary manslaughter were presented for determination by the jury. Evidence of justification or mitigation may come from the State's witness offered to prove the killing or it may come from evidence offered by the defendant. *Smarrs* v. *State,* 131 *Ga.* 21 (2) (61 S. E. 914); *Mann* v. *State,* 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934).

4. "Where under the evidence in the trial of a criminal case the law of voluntary manslaughter is clearly involved, it is the duty of the court to charge the law upon that subject, and he is not relieved of this duty by the mere fact that counsel for the accused in his argument to the jury insists that the law of voluntary manslaughter and of mutual combat is not involved in the case." *Andrews* v. *State,* 134 *Ga.* 71 (67 S. E. 422); *Vincent* v. *State,* 145 *Ga.* 293 (89 S. E. 203); *Hill* v. *State,* 147 *Ga.* 650 (3) (95 S. E. 213).

(*a*) Neither the statement by the defendant before the jury denying that he committed the homicide, nor the failure of his attorney in addressing the jury to urge the above defense, waived or estopped the defendant from complaining in his motion for a new trial of the court's omission to charge the law of justifiable homicide or the law of voluntary manslaughter.

(*b*) The case differs from *Threlkeld* v. *State,* 128 *Ga.* 660 (58 S. E. 49), *Hill* v. *State,* 147 *Ga.* 650 (95 S. E. 213), *Brown* v. *State,* 150 *Ga.* 756 (105 S. E. 289), and similar cases in which the attorneys, in response to direct questions, induced the court to omit to charge, and the omission was complained of in the motion for new trial; and it was held that the defendant was estopped by such conduct of his attorney from complaining of such omission to charge.

5. The error in omitting to charge on the law of justifiable homicide and on the law of voluntary manslaughter requires a reversal of the judgment refusing a new trial.

*Judgment reversed. All the Justices concur, except*

JENKINS, Justice, dissenting. Although the defendant in his statement did not claim justification or mitigation in the commission of the homicide, but on the contrary negatived any such defense by denying that he was the person who did the killing, it is nevertheless true, that, upon it being shown by the State's evidence that the defendant was in fact the perpetrator, he was entitled to the instructions the omission of which is complained of, if under any of the evidence facts or circumstances of justification or alleviation appear. There was no witness to the beginning of the actual encounter save the defendant and his jointly indicted alleged accomplice, who did not testify. Upon proof of the homicide, a presumption of murder arises against the perpetrator, unless circumstances of alleviation, excuse, or justification are shown. *Turner* v. *State,* 139 *Ga.* 593 (3) (77 S. E. 828); *Mann* v. *State,* 124 *Ga.* 760 (supra); *Anderson* v. *State,* 122 *Ga.* 175 (50 S. E. 51); *Delk* v. *State,* 135 *Ga.* 312 (69 S. E. 541, Ann. Cas. 1912A, 105); *Lively* v. *State,* 178 *Ga.* 693, 698 (173 S. E. 836). In my opinion no such circumstances appeared in this case. Certainly it would not seem that the evidence for the State as to the circumstances prior to and leading up to the homicide in any wise tended to suggest that the deceased was then or might have been subse-

quently guilty of making an unprovoked or unjustified assault upon the defendant, such as would justify or palliate the act of the defendant in taking his life. The fact that the deceased peace officer, in charge of the company's property in the large cow-barn at the fair-grounds where the picnic occurred, asked the defendant, upon his first entry in the building late at night, if he had enjoyed the picnic and gave to him and to each of his two companions a bottle of beer, and then instructed them that they "could go ahead home," would not tend to put the deceased then or thereafter in the attitude of a felonious aggressor. Nor could any such inference be drawn from the evidence that upon the subsequent return of the midnight intruder, this time accompanied by only one of his previous companions, the deceased refused to sell them beer, telling them that he had given them all a bottle and that he was not selling beer. The language of the witness McMurray as to this incident is as follows: "Mr. Helton [the deceased] says, 'We done give you a bottle of beer, all of you. We are not selling beer,' and Mr. Helton says, 'I told you to get out of here,' and he run his hand in his pocket and brung out a badge. Mr. Helton says, 'I can give you all a summons, I can make a case against you, but I don't want to make a case against you.'" It appears that after this conversation the defendant was led out of the building by the witness. In the absence of any testimony by the jointly-indicted alleged accomplice as to what happened at the time of the actual homicide upon the third appearance of the defendant and the alleged accomplice in the building, and in view of the fact that the defendant in his statement negatived the defense of justification or mitigation by denying that he was the person who did the killing, if there be any fact justifying or mitigating the homicide, it must be taken from the testimony of this same witness, McMurray. According to this witness, the deceased left him and walked "way back" to the end of the long building, when he was heard by the witness to say: "I thought I told you all to get out from here." "He says, 'I told you all to get out from here'—bam, bam, bam, bam, bam—'Boy, come here, don't let them kill me, don't let them kill me.' Mr. Helton was calling me when he said 'Boy.'"

This testimony, in my opinion, fails to throw any light on whether the defendant who did the killing or the deceased who

fired his pistol was the aggressor, unless the status of the deceased as a custodian and peace officer and of the defendant as a trespasser, and the previous course of conduct of the defendant, and the dying declaration of the deceased would indicate that the *defendant* was such. The further testimony of the witness that he did not hear "any fuss or squabble" before the deceased cried out for help throws no light upon the question as to who was the assailant back in the darkness on the presumably dirt floor of the cow-barn. If the armed defendant advanced toward the deceased, there would have been no sound, and the blade of a knife strikes silently. When McMurray arrived on the scene, the stabbing and firing were over, except the last of the sixteen knife-inflicted wounds had been made. The evidence showed merely that the deceased, who was stabbed to death, fired his pistol and cried out for help from the defendant and the alleged accomplice. This is all that we know, except what might be surmised from the status of the parties and the previous aggressive conduct of the defendant. Accordingly, it is my opinion, that, upon the homicide being thus shown, since none of the antecedent facts put the deceased in the attitude of an aggressor, and since the defendant did not suggest justification or palliation, and since the evidence as to the actual homicide throws no light whatever upon the question as to who was the aggressor, merely showing the stabbing, the shooting, and cry for help of the deceased, there was nothing to dispel the presumption of murder which arose upon the proof of the homicide. The fact that had the *defendant* been killed instead of the deceased officer, the presumption or murder would have arisen against the officer (in the absence of justifying or mitigating circumstances) does not impair the presumption which in fact did arise against the actual perpetrator of the homicide. The fact that after the deceased twice admonished the defendant to leave the building, the deceased while armed with a pistol met the defendant on his third appearance in the building, might conceivably, under the decisions and under other circumstances, suggest the propriety of a charge upon the law of voluntary manslaughter, even though such a defense was not suggested by the defendant and was in terms disclaimed by his counsel in argument to the jury. But this fact loses all significance when it is considered that the deceased was the custodian of the property, and was a peace officer who carried

the weapon upon his person in that capacity. See, in this connection, *Griffin* v. *State*, 113 *Ga.* 279, 282 (38 S. E. 844). The perpetration of the homicide by the defendant having been shown by the evidence, and the defendant by his statement having negatived the defense of justification or palliation, and there being no evidence tending to suggest justification or palliation, it would not seem that the court, who charged upon the defense actually made, committed error in failing to charge as to defenses which were in no wise involved under the evidence or raised by the defendant's statement.