39684.   CUMMINGS v. THE STATE.

DECIDED SEPTEMBER 27, 1962.

*Conger & Conger, J. Willis Conger,* for plaintiff in error.
*Maston O'Neal, Solicitor General,* contra.

JORDAN, Judge.   Evidence presented by the State showed that the deceased James King went to the home of the defendant, a neighbor, in the late afternoon of September 10, 1960, and while standing in the door of the defendant's home was shot in the leg with a pistol bullet, said wound causing his death shortly thereafter.   The deceased, within a few minutes after the shooting, made a dying declaration in which he said, "I went down there to tell him that Bob Sealey wanted to see him and when I opened the door he shot me."   In response to a question as to whether the defendant was drinking, he said "I think he was pretty high."

Dr. Herman Jones, a witness for the State, testified that the bullet extracted from the deceased's leg was fired by the .38 caliber revolver found in the defendant's home.   He further testified that the bullet entered the side of the deceased's left leg from a 90 degree angle at a point 40 inches from the crown of his head, exited at a point 39 inches therefrom, and entered the right leg at a point 37 inches therefrom, and that said bullet severed the femoral artery in the left leg causing the deceased to bleed to death.

The defendant made a statement to the jury, describing the events leading up to the shooting, and then said, "James became more abusive, and I asked him to leave the house.   He cursed me again, and said he would not leave, so I got up and walked over to a desk where I kept a pistol.   It was my idea to make

James leave my house. The desk is close to the door between the screened porch and the sun parlor. As I got the pistol out, James ran into me. We scuffled around and James threw me down on the floor. I do not know how it happened, but during the scuffle, we had gone through the door between the screened porch and the sun parlor, and I was lying on the floor with the upper half of my body on the screen porch and my feet and legs in the sun parlor. While I was on the floor, James leaned over and I thought he was going to get me, as he was making a remark that he ought to cut my head off, but, instead, he reached down and picked up a partly smoked cigar which he had been smoking and walked towards the door leading outside. He told me not to move until he was gone, or he would cut my head off. When he got to the door and started opening it, I thought he was leaving and started getting up. Instead of going on out of the door, James turned and went into a crouched position. I honestly thought he was going to pull out a gun or a knife, and I knew I would not have a chance down on the floor like I was. I realized that I still had my gun in my hand, and, as he turned towards me in his crouched position, I shot at his leg, trying to stop him from further attack. I only did this because I thought he was going to carry out his threat to cut my head off. When I shot, he was standing in the open door, and he sort of lurched out of the door and fell over a camellia bush, which was just a few feet from the door."

The sheriff testified that the defendant was "well intoxicated" when he apprehended him approximately one hour after the shooting. A blood test taken some three hours after the shooting showed a blood alcohol level at that time of 0.23 percent. A similar test of the deceased's blood showed 0.17 percent at the time of his death. A blood alcohol level of 0.15 percent or above raises a presumption that one is under the influence of intoxicants. *Code Ann.* § 68-1625(b)3.

The record in this case is quite lengthy and we have set forth only the salient portions of the evidence. From the entire evidence, and considering all the theories set forth by defendant's counsel, we can only conclude that the verdict of the jury was authorized and, having the approval of the trial court, will not be disturbed.

Even though the jury might have reached the conclusion that the defendant was in a prone or kneeling position when he fired the shot (based on his statement and the trajectory of the bullet), there remained ample evidence to support the verdict. "On the trial of one indicted for murder, a verdict finding the accused guilty of voluntary manslaughter is authorized where, from the evidence or from the defendant's statement to the jury, there is *anything deducible* which would *tend* to show that he was guilty of voluntary manslaughter, or which would be sufficient to raise a *doubt* as to whether the homicide was murder or voluntary manslaughter. *Reeves v. State*, 22 Ga. App. 628 (97 SE 115); *May v. State*, 24 Ga. App. 379, 382 (100 SE 797). It is also well settled that it is the prerogative of the jury to accept the defendant's statement as a whole, or to reject it as a whole, to believe it in part, or disbelieve it in part. In the exercise of this discretion they are unlimited. *Brown v. State*, 10 Ga. App. 50, 54 (72 SE 537); *May v. State*, supra." *Cobb v. State*, 60 Ga. App. 194 (3 SE2d 212).

The general grounds of the motion for new trial are without merit and the judgment overruling it is affirmed.

*Judgment affirmed. Nichols, P. J., and Frankum, J., concur.*