## 40350. FELKER v. THE STATE.

BELL, Justice.

Late in the morning of December 8, 1981, the body of 19-year-old Evelyn Joy Ludlam was found floating in Scuffle Creek, in Twiggs County, near a bridge on the "Cochran short route." She had been missing for two weeks and the last person known to have seen her alive was the appellant, Ellis Wayne Felker.

Felker was charged in Houston County with murder, robbery, rape, aggravated sodomy, and false imprisonment. At trial, a verdict of not guilty was directed on the robbery count, and a jury convicted Felker on the remaining counts. Felker was sentenced to death for the murder. We affirm.

The victim, Joy Ludlam, was a student at Macon Junior College and worked as a cocktail waitress at the Holiday Inn in Warner Robins. Her parents were residents of Macon but, about 10 months

prior to her death, Joy had moved to Warner Robins to live with an older woman whom Joy had met through church. Not being entirely satisfied with her job at the Holiday Inn (her religious beliefs did not allow her to work Friday nights or Saturdays), Joy had begun to seek other employment prior to her death.

On Monday evening, November 23, 1981, between 11:00 and 11:30 p.m., Wayne Felker visited the lounge where Joy worked. He was wearing a T-shirt advertising "The Leather Shoppe," a business that he owned in Warner Robins.

Felker had been convicted in 1976 of aggravated sodomy. In April of 1981, shortly after his release from prison, Felker opened his leather shop. A neighboring businessman testified that from April until June, Felker's business gradually increased. Felker began to lose interest in the business, however, and, from September onward, was seldom there. His neighbor collected his mail for him. Felker attributed his disinterest to his romance with Patricia Woods, whom he met not long after he opened his business. Felker testified that after he and Ms. Woods began living together, he "more or less let the business fail." He admitted that the shop's checking account was overdrawn the night he met Joy Ludlam and that he had been making ends meet by borrowing money from his parents (who owned the house in which he lived), and by selling some of his furniture.

Nonetheless, when Joy noticed Felker's T-shirt advertising his business, a conversation ensued which culminated in an offer of employment, pursuant to which they were to meet the next day.

Pat Woods had left Felker the previous Saturday after he had blackened both of her eyes, so he was alone Tuesday morning when Joy arrived. A neighbor, who had been asked by Felker's mother to keep track of the cars visiting Felker's house, noticed Joy's arrival at approximately 9:00 a.m. and wrote down the tag number of her car. The neighbor testified that the car was gone by 11:00 a.m.

Felker testified that he was at home awaiting a hoped-for call from Pat Woods. He testified that, when Joy arrived and wanted to see the shop, he told her that he was expecting a call and could not go then.

Joy returned to her residence at approximately 2:00 p.m. A visitor to the residence, Ms. Akins, testified that, some time after 2:30 p.m., Joy made a telephone call during which she mentioned that she "would like to see the shop." According to Ms. Akins, Joy left around 5:00 p.m. wearing a long, plaid coat.

At approximately 6:30 p.m., Joy called the manager of the Holiday Inn lounge and told him that the mother of the lady with whom she lived was in the hospital and that Joy wanted to stay with

her. The manager gave her the night off.

When Guy Starling, office manager of the Trust Company Bank in Warner Robins, left work Tuesday evening, between 6:30 and 7:30 p.m., he noticed an automobile parked in the bank's parking lot that did not belong to any of the bank's employees. He wrote down the tag number. The car was still there the next day.

Irma Anthony, with whom Joy lived, spent Tuesday night at the hospital with her mother. She returned home Wednesday morning to discover that Joy was not there. As evening approached and Joy still had not returned, she went to the police, taking with her a photograph of Joy and a napkin on which had been written Felker's telephone number and the address of his leather shop. Two officers visited Felker Wednesday evening at approximately 5:30 p.m. Felker told them that he had met Joy the previous evening pursuant to his offer of employment. He told them that she had left his shop at around 6:00 p.m. because that was when the shop closed. He said that they had traveled in separate cars and that, although he had opened and closed the door for her, he never got into her car, nor had she got into his. He stated that when he last saw her, she was wearing a plaid coat and a red dress.

Joy's mother, having been informed of her daughter's disappearance, drove to Warner Robins on Thursday to search for her. Mrs. Ludlam found Joy's car parked in the parking lot of the Trust Company Bank at about 2:30 p.m. The car was locked. She notified the police, who subsequently searched the car and found, on the front seat, a notebook opened to a page on which was written, in Joy's handwriting: "I'm going to Atlanta to eat dinner with Wayne and some of his friends. They are GS-11's on base. Joy."

On December 1, with Joy still unlocated, investigators questioned Pat Woods, who had resumed her cohabitation with Felker. Soon afterwards, Felker collected some of his pornographic magazines and his bondage cuffs (3-inch wide leather straps with "watch-band" buckles) and threw them in a garbage dumpster.

On Tuesday, December 8, 1981, two weeks after she disappeared, Joy's body was discovered in Scuffle Creek by a mechanic who was searching the right-of-way along the Cochran short route, looking for discarded bottles and cans. She was clothed in the same plaid coat and red dress that she had been wearing when last seen alive.

An autopsy was conducted the following morning. Warren Tillman, a medical examiner with the state crime lab, observed that pantyhose and underwear were still on the body but that the crotch of each had been ripped out. On her face, around her eyes and mouth, were lines of a whitish material which, on examination, appeared to

be an adhesive substance. Tillman noted hemorrhaging inside the eyelids indicative of asphyxiation, and contusions at the junction of the lips indicative of some sort of force against her mouth. On her neck was a long, narrow area of bruising. On her breasts, he observed ecchymotic hemorrhage consistent with having been induced by suction. There were bruise marks on her left shoulder and on her right thigh. There were marks on her left wrist and on her ankles consistent with their having been bound. Tillman observed areas of contusion around the vagina and anus, which was distended, indicating traumatic entry of these orifices. On internal examination, Tillman noticed an area of hemorrhage near the second, left rib, that had no associated surface bruising, which was consistent with force having been applied by an object such as a fist or a foot. He observed a number of areas of subgaleal hemorrhage on the inside of the scalp. However, there was no evidence of brain hemorrhage. Examination of the lungs indicated that Joy had been dead when she was placed in the water. Tillman concluded that the cause of death was asphyxiation from strangulation.

Establishing a time of death proved difficult. Tillman's original estimate, based on the state of decomposition of the body, was that Joy had been dead 3 to 5 days, or possibly longer — the immersion of the body in the water complicated the determination. After receiving information regarding air temperature, and reviewing other case histories involving bodies immersed in water, Tillman concluded that Joy had been dead at least three to five days, and that she could have been dead for two weeks.

On February 4, 1982, Joy's body was exhumed. Sections of tissue were taken from bruised areas on her body. Dr. James Whitaker, medical examiner for Houston County, microscopically examined these tissue samples to ascertain the extent of "margination." Dr. Whitaker concluded that the bruises had been inflicted within 4 to 6 hours prior to death.

On February 16, 1982, a hunter found Joy's purse on the north side of Highway 96, near the Houston-Twiggs county line, 3 to 4 miles west of the intersection of Highway 96 and the Cochran short route. Besides her driver's license and college I.D., the purse contained a "Mickey Mouse" pendant which Joy habitually wore on a chain necklace. The necklace itself was never found.

Between December 8, 1981, and March 29, 1982, Felker's house and car were searched several times. Hairs and fibers were collected and microscopically compared with hairs and fibers found on the body. Fibers found on the victim's coat were consistent with fibers present in a yellow and orange blanket first observed in Felker's home and later retrieved by police from his parents. Fibers similar to those

of the victim's coat material were found in the hatchback area of Felker's automobile. Hairs were found on the victim's clothes, including her underclothes, and on her body, that were similar to Felker's head and beard hair. Hairs adhering to two handkerchiefs in the victim's pocketbook were similar to Felker's head hair. In addition, several hairs discovered in the bedroom of Felker's home were similar to the victim's head and pubic hair.

Felker had been involved in an earlier incident involving bondage and forcible sex. This incident was described at trial by the victim. On October 3, 1976, Jane W., a cocktail waitress, stopped by a Sambo's restaurant for coffee after she got off work. Then she drove home, alone. As she pulled into her driveway, a car stopped in front of her house and the driver called to her. The driver (she later discovered) was Wayne Felker, who told her that he was lost, and that he was looking for a party on Navarro Drive. Ms. W., who had recently moved to Warner Robins, had heard of Navarro Drive and knew that it was nearby. Felker, a lifelong resident of Warner Robins, told Ms. W. that he had no idea how to get to Navarro Drive, that he was in a friend's car, and that he was supposed to meet the friend at the party. Ms. W. agreed to get him to the general area. She got in her car and proceeded towards Navarro Drive, followed by Felker in his car. She was unable to find the right street. Eventually, they drove by Sears, and Felker passed her car and turned into the Sears parking lot. She pulled in behind him. He got out, approached her car, and told her that he was too drunk to drive anymore and that he would get in trouble if he damaged his friend's car. He asked Ms. W. if she could drive him to his friend's wife's house, which he knew to be just down the road. Ms. W. testified that, "he was so nice . . ., he acted so lost . . ., [he] sounded so convincing . . . [that] I unlocked the door [and] he got in the car."

Felker directed her to a trailer on Porkie Drive. She waited in the car while he went inside. A few minutes later, he returned. The friend's wife was getting dressed and would take him to the party after she woke the baby up. He asked Ms. W. if she could wait a few more minutes, so that she could take them back to the friend's car. She answered that she could, but that she had to use the bathroom. Felker invited her inside. She accepted his invitation and, leaving her pocketbook in the car, entered the house and began walking down the hall, followed by Felker. About halfway down the hall, she "realized that there didn't seem to be anybody else in there . . . there was no light; there was no lady; there was no child; . . . there didn't even seem to be . . . another bedroom . . ." She turned around. Felker grabbed her around the neck and started choking her.

He carried her to the bedroom and threw her, face down, onto

the bed. As he held her head down with one hand, he pulled one of her arms behind her back. He tied a rope around it, pulled the other hand back, and then tied her hands together.

Next, he laid her, face down, on the floor and tied her feet together. Felker placed some cotton over her eyes and taped her mouth and eyes with duct tape. Then he tied her to the bed, and left.

Ms. W. heard him drive off. Ten or 15 minutes later, she heard him return, driving a different car.

He proceeded to the bedroom, where he untied her feet and laid her on the bed. He took her necklace off. He tied her hands to the corners of the bed and undressed her from the waist down, ripping her underwear. He cut and then ripped off her shirt and bra, and tied her legs to the other two corners of the bed.

Then he asked her, in effect, whether she had ever been anally sodomized. When she did not answer (she was still gagged), he punched her on her right thigh with his fist, pounded her on her chest, and said, "I'm talking to you."

Felker then attempted to anally sodomize Ms. W. She testified that she struggled so much that Felker was unsuccessful in this attempt, but that after Felker violently struggled with her, and grabbed her and punched her with his fists, he became sufficiently aroused that he was able to rape her.

Then, after Felker obtained a vibrator or some similar object and "rammed" it inside Ms. W., he removed the duct tape from her mouth and orally sodomized her.

Afterwards, Ms. W. talked to Felker and finally convinced him to untie her hands and feet so that she could use the bathroom. Untied, but still blindfolded, she was guided to the bathroom and then back to bedroom. Felker lay down beside her and fell asleep. Ms. W. left and called the police. As she left, she picked up her pocketbook, which was in the bathroom. She later discovered, in the bottom of her purse, the pendant from her necklace. She never recovered the necklace itself.

Evidence was offered by Felker in support of his contentions that the 1976 incident involved consensual sex, that he last saw Joy Ludlam at approximately 6:00 p.m. on November 24, 1981, and that she had not been dead for two weeks when her body was discovered.

Regarding the 1976 incident, Felker testified that he had stopped in front of Ms. W.'s home to ask directions to a party on Navarro Drive, even though he was a life-long resident of Warner Robins. (In fact, during the sentencing phase of the trial, it was revealed that his aunt lived on Navarro Drive in 1976). Felker claimed that he invited Ms. W. to the party and that she accepted. He testified that they stopped at the Sears parking lot when they could

not find the party, and decided to go to his trailer. He parked his car for fear that, because he had been drinking, he was going to be stopped by the police if he continued driving. They proceeded to his trailer in her car. Upon their arrival, she went to the bathroom. Felker (presumably, no longer worried about being stopped for DUI) decided to drive to the store to get cigarettes. After discovering that her car was low on gas and remembering that there were cigarettes in his car, he drove to Sears and switched cars. When he returned, Ms. W. was looking at his bondage magazines and expressed an interest in having sex while being tied up. Everything that followed, Felker said, was with her consent.

On cross-examination, Felker admitted that he might possibly have inflicted the circular bruise on her right thigh and other bruises on her body, and that he "might have gotten too rough." He admitted that he had been at Sambo's earlier, but claimed that he had not followed Ms. W. and that their meeting had been coincidental. He admitted removing her necklace, but did not know why he had done so, nor could he explain how the pendant wound up in her purse, absent its necklace. He explained that he had taped her mouth because she "was giggling." He did not recall why he had taped her eyes. He did not know why he tied her up before removing her clothes, nor did he know what she was going to wear home after her clothes had been cut.

Regarding the disappearance of Joy Ludlam, Felker testified that when she called Tuesday morning, he was asleep in a recliner in the living room, covered up with his orange and yellow blanket. After her morning visit, he went to his shop to retrieve a compressor, some spray guns, paint and so forth, that he intended to use to refinish some furniture. He loaded these items into the hatchback area of his car and returned home.

When Joy stopped by his house later that day, she took off her coat and laid it on the recliner. She made a telephone call while he changed clothes. When they exited the house, Felker realized that he had not yet unloaded his car. Although Joy "seemed to be in a hurry," Felker nonetheless took the time to unload his car before they left. As he was doing so, she observed a number of leather catalogs in the back of his car. Felker told her to go ahead and take one. She still had her coat on her arm as she leaned into the hatchback area of the car to reach "all the way to the back part of the back seat." Then she went to her car and sat in the driver's seat thumbing through her catalog. (No such catalog was discovered in the search of her car two days later.)

According to Felker, he last saw Joy Ludlam as she left his leather shop that evening. On his way home he stopped by Sears. (Sears is across the street from the Trust Company Bank where Joy's

car was parked when Guy Starling left work between 6:30 and 7:00 p.m.)

Felker testified that he left his house twice that night. The first time, he went to a convenience store to purchase beer and cigarettes. Sometime after midnight, he left to "drive around looking for Pat [Woods]." Felker admitted that Pat had called him around 10:30 p.m. and that they had agreed to meet the next morning. He knew that she had no car. When asked by the district attorney how he expected to find her, Felker answered that he was "[h]oping she'd be in a yard somewhere." Felker denied that the real purpose of the trip was to dispose of Joy Ludlam's body. He admitted that he was unable to find Pat Woods standing out in someone's yard in the wee hours of the morning, and that he returned home alone.

Regarding the length of time that Joy Ludlam had been dead when her body was discovered, Felker retained the services of a geologist and Dr. Joseph Burton, the chief medical examiner for Fulton and DeKalb counties.

The geologist measured air and water temperatures at Scuffle Creek from November 28 through December 2, 1982. Air temperatures varied from lows of around $60^0$ (Fahrenheit) to highs of about $80^0$. Water temperature remained fairly constant about $60^0$. On December 11 and again on December 19, the water temperature was again measured and a low water temperature of $43^0$ was recorded.

Air temperatures for 1981 were available through the National Weather Service, which indicated that the comparable period in 1981 was colder. Between November 24, 1981, and December 8, 1981, low temperatures ranged from $31^0$ to $50^0$ (seven days having lows in the 30's and six days having lows in the 40's) and high temperatures ranged from $55^0$ to $75^0$ (four days having highs in the 50's and seven days having highs in the 60's).

Dr. Burton — based upon his examination of the autopsy photographs; the report of Warren Tillman and the latter's description of the extent of decomposition; an assumption (having some support in the evidence) that there was stiffness in the body when it was removed from the water; an assumption that the water temperature remained relatively constant in the mid-50's; the lack of skin slippage;[1] the lack of bloating; and the lack of signs that animal life had fed upon the body — testified that, although his estimate was "fraught with error" because of the number of variables that had to be considered, in his opinion, death occurred between three and five

---

[1] All the experts agreed that hands would suffer immersion wrinkling (Joy Ludlam's did) and that eventually the skin would separate from the hand. This separation, called slippage, was not present in this case.

days before the body was discovered.

Dr. Whitaker, the medical examiner for Houston County, testified for the state in rebuttal. His early experience was in Baltimore, Maryland, and, perhaps due to the proximity of Chesapeake Bay, he had observed over "200 drowning or immersion-type cases." Dr. Whitaker testified that — considering the air temperatures in the relevant time period; the fact that most missing and murdered persons die soon after they disappear; the fact that when Joy Ludlam was found, she was wearing the same clothes as when she was last seen alive; and the extent of decomposition — in his opinion, death occurred two weeks prior to the discovery of the body.

1. We address, first, appellant's enumerations of error regarding his prior conduct.

(a) In his tenth enumeration of error, appellant contends that evidence of the commission of rape and sodomy in 1976 was irrelevant and impermissibly placed his character in issue.

A defendant's guilt "may not be proved by showing the commission of other crimes to prove that the accused has a criminal nature." *Williams v. State,* 251 Ga. 749, 784 (4) (312 SE2d 40) (1983). However, evidence of other criminal acts of the defendant may be admitted if it " 'is substantially relevant for some other purpose than to show a probability that (the defendant) committed the crime on trial because he is a man of criminal character, . . . .' " *Walraven v. State,* 250 Ga. 401, 407 (297 SE2d 278) (1982) (quoting McCormick on Evidence, § 190 at 449, 2d Ed. 1972).

Similarity between the charged crime and the extrinsic crime is an important factor pertinent to a determination of the admissibility of the extrinsic crime. However, it is not the only factor, nor is it necessarily the controlling factor. "The ultimate issue in determining the admissibility of evidence of other crimes is not mere similarity but relevance to the issues in the trial of the case." *Williams v. State,* supra, 251 Ga. at 784. Depending upon the purpose for which the extrinsic offense is offered, "the state may be required to prove a high degree of similarity between relevant characteristics of the extrinsic offenses and the charged crimes, or it may only have the burden of showing a logical connection between crimes which are essentially dissimilar. [Cits.]" *Williams v. State,* supra, 251 Ga. at 811 (Smith, J., dissenting).[2]

---

[2] "To take a dramatic example, defendants' knowledge that they did not have permission to take a car can be proven by evidence that they murdered the owner." Wright and Graham, Federal Practice and Procedure, § 5245, p. 506 (1978).

Since the admissibility of an extrinsic offense depends, in the first instance, upon its relevance, the factual and legal issues involved in the case are controlling. The degree of similarity sufficient to support admissibility in one case might be insufficient in another.

Thus, *Williams v. State,* supra, on which the state relies, is inapposite. In *Williams,* we found that the "sheer number" of homicides committed for no apparent motive, having sufficient other characteristics in common to demonstrate a "pattern of killings," all of which were logically connected to Williams by hair and fibers, allowed an inference of guilt that derived from the improbability that so many connections to so many of the murder victims could be innocent.[3] See United States v. Woods, 484 F2d 127 (4th Cir. 1973).

In the instant case, on the other hand, we find that the extrinsic offenses proved by the state were "so nearly identical in method as to earmark them as the handiwork of the accused." McCormick on Evidence, supra at 449. The evidence produced by the state showed a distinctive modus operandi and was thus relevant to prove identity, which was clearly a disputed issue in the case.

The similarities are numerous and distinctive: Each victim was a young, white female employed as a cocktail waitress. Each was lured into appellant's company by deceitful means. (Ms. W. was asked for help in finding a nonexistent party by a man who claimed to be from out of town, but who was, in fact, a lifelong resident of Warner Robins. Ms. Ludlam was offered employment in a defunct business.) Both women were separated from their automobiles, which were subsequently found in parking lots which are across the street from each other. Both women were bound at their ankles and wrists. Ms. W.'s mouth and eyes were covered with duct tape. When Ms. Ludlam's body was recovered, she had lines of adhesive on her face which were visible in the photographs admitted in evidence, and which were obviously the outline left by the removal of tape from over her eyes and mouth. Each victim was bruised on her breasts and each had a circular bruise on her right thigh. Each victim was choked. Each victim was beaten. (Ms. W. testified that appellant pummelled her with his fists. Ms. Ludlam's body showed areas of mild hemorrhage under the skin of her chest and scalp.) The underclothes of each were

---

[3] "Rather than search the digests for a category into which the proposed use can be crammed, courts should examine the complete chain of inferences necessary to make the evidence of other crimes relevant and admit or exclude the evidence on the basis of whether it is or is not offered to prove some conduct of the accused and whether it does or does not require an inference as to his character." Wright and Graham, supra, § 5240, pp. 477-478.

torn. Each victim was sexually abused. The chain necklace of each was removed. The pendants from both necklaces were later found in the victims' pocketbooks, while the necklaces themselves disappeared in both cases.

Appellant contends that there are dissimilarities between the two offenses. For example, one victim was 19 and the other was 24. More significantly, one victim was murdered and the other was not.

We agree that the two offenses are not identical. However, we find the similarities to be sufficiently numerous and distinctive to justify an inference that both crimes were perpetrated by the same person. Appellant's contention that the extrinsic offense was irrelevant is meritless.

(b) In his eleventh enumeration of error, appellant contends that the extrinsic offense was inadmissible because, although he was convicted in 1976 of aggravated sodomy, he was acquitted on the rape count.

Appellant relies upon Ashe v. Swenson, 397 U. S. 436 (90 SC 1189, 25 LE2d 469) (1970) (holding that the concept of collateral estoppel is part of the double jeopardy prohibition of the Fifth Amendment, enforceable against the states through the Fourteenth Amendment), and two Fifth Circuit cases relying upon Ashe v. Swenson to hold that "where the state in an otherwise proper prosecution seeks for any purpose to relitigate an issue which was determined in a prior prosecution of the same parties, then the evidence offered for such a relitigation must be excluded from trial . . ." Wingate v. Wainwright, 464 F2d 209, 215 (5th Cir. 1972). Accord, Blackburn v. Cross, 510 F2d 1014 (5th Cir. 1975).

These Fifth Circuit cases, of course, are not binding precedent for this court. Conner v. State, 251 Ga. 113 (5) (303 SE2d 266) (1983). Ashe v. Swenson does not answer the question whether double jeopardy precludes the evidentiary use of crimes for which there has been a prior acquittal or applies only in situations of reprosecution. The facts of Ashe v. Swenson involved only the latter situation. Other federal courts have rejected the notion that extrinsic crime evidence is inadmissible per se if the defendant has been acquitted of the extrinsic offense. See, e.g., United States v. Van Cleave, 599 F2d 954 (10th Cir. 1979); United States v. Castro-Castro, 464 F2d 336 (9th Cir. 1972). Some courts have suggested that an acquittal is a factor that must be considered when balancing the relevance of the proffered evidence against the prejudice created by it. See, e.g., United States v. Smith, 446 F2d 200 (4th Cir. 1971); United States v. Phillips, 401 F2d 301 (7th Cir. 1968). Compare, Smith v. Wainwright, 568 F2d 362 (5th Cir. 1978) (holding that where the prosecution used an extrinsic offense to prove another crime, the conviction obtained thereby was

not invalidated by a subsequent acquittal in the trial of the extrinsic offense, in view of the fact that the extrinsic offense need not have been proven beyond a reasonable doubt in the first trial, and considering a jury's practical power to pardon).

Appellant was convicted in 1976 of aggravated sodomy. The jury thereby rejected appellant's defense of consent, to that offense at least.[4] In any event, identity was not an issue in the 1976 case. Thus, the acquittal on the rape count does not indicate that the jury had a reasonable doubt that it was appellant, and not someone else, who bound and gagged the victim, ripped her underwear, bruised her, and removed her necklace.

The relevance of the 1976 offense does not hinge on whether appellant committed all of the elements of the offense of rape. Thus, it is not the case that "some issue necessary for the prosecution's case in the second trial has necessarily been found for the defendant in the first trial." Johnson v. Estelle, 506 F2d 347, 350 (5th Cir. 1975). (Emphasis omitted.)

We note that appellant was allowed to present to the jury the fact of his acquittal on the rape count. His contention that the 1976 crime was inadmissible, because of the acquittal, is meritless.

(c) In his twelfth enumeration of error, appellant raises several issues.

First, he contends that the trial court erred by failing to instruct the jury regarding the standard of proof that appellant committed the 1976 crime. We disagree. The admissibility of the evidence is a matter for the court. Cf., *Castell v. State,* 250 Ga. 776 (10b) (301 SE2d 234) (1983). See also, Wright and Graham, supra, § 5249, pp. 533-534.

Second, he contends that the court's instructions were erroneous because the court failed to mention identity and modus operandi. The trial court charged the jury that it had admitted evidence regarding the 1976 crime "solely for you to decide whether it might tend to illustrate the defendant's motive, intent or state of mind with respect to the charges for which [he] is now on trial, and for no other purpose."

At trial, the state had contended that the prior crime showed, inter alia, identity. On appeal, the state contends that the prior crime showed identity by demonstrating a modus operandi. However, at trial, the state did not object to the court's instruction, which failed to

---

[4] Aggravated sodomy, of which appellant was convicted, is defined as the commission of sodomy "with force and against the will of another person." OCGA § 16-6-2 (Code Ann. § 26-2002).

mention identity as a purpose for the admission of the evidence.

A similarly defective instruction was considered in United States v. Baldarrama, 566 F2d 560, 567-568 (5th Cir. 1978). The Fifth Circuit had before it a circumstantial case in which the prior crime was "really necessary" to prove identity. Ibid. However, the trial court had failed to identify identity as a basis for the admission of evidence and had instructed the jury that the "prior conviction was introduced solely for the purpose of determining [the defendant's] intent, or to show a common scheme or design." Id. at 567.

The Fifth Circuit said: "In all likelihood, the omission of 'identity' from the jury instruction was inadvertent, as the Government had previously stated that identity was one of the possible uses of the evidence. The trial court's technical omission does not preclude our examination of the validity of identity as a basis for admission." Id. at 567. Accord, State v. Johnson, 316 NW2d 652 (S. D. 1982).

We find this reasoning persuasive. Without determining whether the 1976 offense was admissible to show motive, which the court did charge, as well as modus operandi, which the court did not charge, we conclude that the instructions given do not preclude our identification of modus operandi as the most compelling justification for admission, nor do they preclude our consideration of the prior offense in our determination of the sufficiency of the evidence to support appellant's convictions.

Finally, appellant contends that the trial court further erred by failing to charge appellant's "sole defense" to the 1976 offense, i.e., consent, citing the rule that the failure to charge a defendant's sole defense is reversible error even absent a request. See, e.g. *Johnson v. State*, 135 Ga. App. 360 (4) (217 SE2d 618) (1975); *Glaze v. State*, 2 Ga. App. 704 (3) (58 SE 1126) (1907). Pretermitting whether this rule is applicable to an extrinsic offense, we find that the rule enunciated in *Booker v. State*, 247 Ga. 74 (274 SE2d 334) (1981) as to an affirmative defense applies, a fortiori, to sole defenses of extrinsic offenses. "If an affirmative defense is raised by the evidence, including the defendants' own statements, the trial court must present the affirmative defense to the jury as part of the case in its charge, even absent a request. The affirmative defense, however, need not be specifically charged if the case as a whole is fairly presented to the jury. [Cit.]" Ibid.

In a case involving charges of rape and aggravated sodomy, the effect of a consent defense is simply to traverse the state's proof. Thus, the failure to specifically charge on consent as a sole defense to an extrinsic offense, absent a request for such charge, was not reversible error. Cf., *Rivers v. State*, 250 Ga. 288 (8) (298 SE2d 10)

(1982).

Appellant's twelfth enumeration of error is meritless.

(d) In his thirteenth and fourteenth enumerations of error, appellant complains of the trial court's refusal to give two of appellant's requests to charge. We find that neither request to charge was an accurate statement of the law and that the trial court did not err by refusing to charge them.

(e) In his sixteenth enumeration of error, appellant contends (1) that the state failed to comply with an order requiring pre-trial determination of the admissibility of any prior criminal activity and (2) that prior conduct other than the 1976 crime was introduced and impermissibly placed appellant's character in issue.

Our review of the record persuades us that appellant's motion in limine did not seek a pre-trial, final ruling on the admissibility of prior conduct, that there was no order requiring a pre-trial determination of admissibility of any prior criminal activity, and that there was, in fact, no pre-trial ruling on the admissibility of any prior conduct other than the 1976 crime. See *State v. Johnson,* 249 Ga. 413 (3) (291 SE2d 543) (1982). Thus, the rule announced in *Harley-Davidson Motor Co. v. Daniel,* 244 Ga. 284 (1) (260 SE2d 20) (1979) is inapplicable to anything except the 1976 crime.

The first contention made in this enumeration of error is meritless. We address the instances of prior conduct in order:

(1) On Monday, November 23, 1981 (the day prior to the disappearance of Joy Ludlam), appellant purchased a vibrator. Appellant's only objection at trial was that the purchase was irrelevant and immaterial. No "character" objection was made. " 'An objection to the admission of evidence on the ground that it is "immaterial and irrelevant" is not such an objection as it would be reversible error to overrule.' " *Shouse v. State,* 231 Ga. 716, 717 (4) (203 SE2d 537) (1974) (quoting *Pippin v. State,* 205 Ga. 316 (6) (53 SE2d 482) (1949).

(2) Appellant admitted on cross-examination that he had blackened the eyes of Pat Woods on Saturday prior to Ms. Ludlam's disappearance. He had already mentioned this in his direct examination, and when it came up again during the cross-examination, no objection was interposed, leaving nothing for us to review.

(3) Appellant admitted on cross-examination that he practiced sexual bondage. He had already admitted on direct examination that he had been introduced to bondage by his third wife who worked in a massage parlor. There was no objection to the cross-examination on this same subject, again leaving nothing for us to review.

(4) We reach the same result regarding appellant's testimony on

cross-examination that he was still married to his third wife when he met Ms. W.

(5) There was no proper objection to appellant's admission on cross-examination that he had experienced anal intercourse with one of his wives.

(6) Regarding appellant's third wife, who worked at a massage parlor, the district attorney asked, "Did you ever encourage her to have relations with other men?" Appellant answered, "No, sir." Appellant's attorney objected to this question and answer on the ground that it was irrelevant and placed his character in issue.

We find that the question was improper and that the court erred by overruling the objection to it. However, in view of the answer given, we conclude that the error was harmless. *Johnson v. State,* 238 Ga. 59 (230 SE2d 869) (1976).

(7) In appellant's home and at his leather shop were discovered a number of hand-drawn depictions of various sexual acts, including bondage, whipping, spanking and other deviances. One drawing depicts a young, smiling woman with long, dark hair, who strongly resembles Joy Ludlam. Around her neck is what appears to be a chain necklace and a pendant.

Possession of these drawings was no crime. Stanley v. Georgia, 394 U. S. 557 (89 SC 1243, 22 LE2d 542) (1969). Thus, their admission in evidence did not violate OCGA § 24-9-20 (b) (Code Ann. § 38-415 et seq.). However, "the rule about the proof of other crimes is but an application of the wider prohibition against the initial introduction by the prosecution of evidence of bad character." McCormick on Evidence, supra at 447. This wider prohibition is contained in OCGA § 24-2-2 (Code Ann. § 38-202). Like OCGA § 24-9-20 (b) (Code Ann. § 38-415 et seq.), OCGA § 24-2-2 (Code Ann. § 38-202) does not bar evidence simply because it might incidentally reflect on the defendant's character. If that were the case, the state could never prove the crime charged.

We find no error in the admission of these drawings. In arriving at this conclusion, we observe that this was not simply a case of a rape defendant possessing erotic literature.[5] These drawings, particularly in conjunction with other evidence presented, tend to establish that appellant was motivated by a desire for forced and violent sex, and thus, help to establish that appellant was the person who violently sexually abused and murdered Joy Ludlam. The fact that one of the

---

[5] See Wright and Graham, supra, § 5240, pp. 482-483: "As one writer has suggested, evidence that a person was motivated by sexual desire does not establish that he intended to gratify those desires by the use of force." (Footnote omitted.)

drawings depicts a young woman closely resembling Ms. Ludlam adds force to this conclusion.

(8) A witness for the state testified that he met appellant at the Holiday Inn where Ms. Ludlam worked, the evening before she disappeared. The district attorney asked the witness, "Did y'all do anything?" The witness answered, "Yes, sir, after we sit there for a while and talked, we went out into my van and smoked a joint."

Appellant's attorney moved for mistrial, which was denied. No curative instructions were requested and none were given.

The state has not suggested how this testimony might have been relevant. We find that it was not. However, we do not agree with appellant that the trial court erred by denying his motion for mistrial. *Sabel v. State,* 250 Ga. 640 (5) (300 SE2d 663) (1983). Moreover, while the court should have instructed the jury to disregard the answer of the witness, we find that, in this case, it is highly probable that testimony that appellant "smoked a joint" did not contribute to the verdict. Thus we find no reversible error. *Castell v. State,* supra, 250 Ga. 776 (8).

(f) Appellant's fifteenth enumeration is answered above.

2. Next we address appellant's contentions regarding venue.

(a) In his fourth enumeration, appellant contends that the trial court erred by denying several pre-trial motions seeking to dismiss all or part of the indictment on the ground that the grand jury did not hear sufficient evidence on venue to justify the return of a true bill on the indictment.

There is in this state some authority for the proposition that although the sufficiency of the evidence will not be inquired into, an indictment will be quashed where it is returned on wholly illegal evidence. See, e.g., *Brown v. State,* 121 Ga. App. 228 (1) (173 SE2d 470) (1970), which cites *Meriwether v. State,* 63 Ga. App. 667 (11 SE2d 816) (1940), which, in turn, cites *Summers v. State,* 63 Ga. App. 445 (3) (11 SE2d 409) (1940). In *Summers,* the Court of Appeals held that, "where ... it appears that a competent witness or witnesses were sworn and examined before the grand jury by whom the indictment was preferred, a plea in abatement on the ground that it was found on insufficient evidence, or illegal evidence, or no evidence, *will not be sustained,* because it comes under the rule that no inquiry into the sufficiency or legality of the evidence is indulged." Id. at 449. (Emphasis supplied.)

We believe that *Summers* states the correct rule. Dicta in later cases implying any broader basis for quashing an indictment for lack of evidence will not be followed. See, e.g., *Brown v. State,* supra; *Meriwether v. State,* supra; and *Reaves v. State,* 242 Ga. 542 (2) (250 SE2d 376) (1978). Appellant contends that there was no evidence

presented to the grand jury which would support a finding that proper venue lay in Houston County. However, it was shown by the state that competent witnesses were sworn and examined before the grand jury. Thus the trial court did not err by denying appellant's pleas in abatement and motion to quash.

(b) OCGA § 17-2-2 (Code Ann. § 26-302) provides, in part:

"(c) Criminal homicide. Criminal homicide shall be considered as having been committed in the county in which the cause of death was inflicted. If it cannot be determined in which county the cause of death was inflicted, it shall be considered that it was inflicted in the county in which the death occurred. If a dead body is discovered in this state and it cannot be readily determined in what county the cause of death was inflicted, it shall be considered that the cause of death was inflicted in the county in which the dead body was discovered. . . .

"(h) Crime in more than one county. If in any case it cannot be determined in what county a crime was committed, it shall be considered to have been committed in any county in which the evidence shows beyond a reasonable doubt that it might have been committed."

Appellant contends that in a case of homicide, use of subsection (h) to determine venue is precluded by subsection (c). We disagree. Subsection (h) applies by its terms to "any case."

Alternatively, he contends that if subsection (h) and subsection (c) may both apply to homicide cases, then subsection (h) is unconstitutionally vague and indefinite. We have already held that subsection (h) is not unconstitutionally vague or indefinite when applied in non-homicide cases. *Adsitt v. State,* 248 Ga. 237 (5) (282 SE2d 305) (1981); *Bundren v. State,* 247 Ga. 180 (1) (274 SE2d 455) (1981). We see no reason to hold to the contrary here. Appellant's sixth enumeration of error is meritless.

(c) The court instructed the jury as follows:

"One of the elements in every criminal case is the matter of venue; that is, the state must prove that the crime occurred in the county in which the case is being tried. For example, if a crime occurs in Houston County, then the trial for that crime shall be in Houston County.

"In a murder case, the trial may be held in the county where the cause of death was inflicted or in the county where death actually occurred, if it cannot be determined where the cause of death occurred.

"The defendant in this case contends that the state has not proved the element of venue. In that respect I instruct you that it is the state's burden, with respect to each charge in the indictment, to

prove beyond a reasonable doubt that the crime might have been committed in Houston County. If the state fails to do this, then the defendant is entitled to a verdict of not guilty."

In his fifth enumeration, appellant contends that this charge was error, not only because the court charged subsection (h) of the venue statute, but also because the court omitted to charge the jury that proper venue could lie in the county in which the body was found.

We find no error. The state contended that venue lay in Houston County, and the court correctly charged the state's burden of proof in that regard, as provided by subsection (h). Venue either was or was not appropriate in Houston County. That was the issue before the jury. That venue might also have been appropriate in Twiggs County, where the body was found, pursuant to subsection (c), was not material to any issue before this jury.

Appellant's fifth enumeration of error is meritless.

(d) Appellant's seventh enumeration of error is answered by the foregoing.

3. In his second enumeration, appellant contends that the trial court erred by failing to give his requested charge on the necessity of proving corpus delecti. The charge that the court did give, however, covered substantially the same principle. (The court charged that "the state must prove beyond a reasonable doubt that a crime was in fact committed . . .") This enumeration of error is therefore meritless. *Kelly v. State,* 241 Ga. 190 (4) (243 SE2d 857) (1978).

4. Appellant's first and third enumerations attack the sufficiency of the evidence. He was convicted of murder, false imprisonment, rape, and aggravated sodomy.

(a) Appellant correctly observes that the evidence was circumstantial. However, when considered in its entirety, it compellingly demonstrates that appellant murdered Joy Ludlam and deposited her body in Scuffle Creek prior to the visit by police to his home on the evening of November 25. We find the conviction for murder to be amply supported by the evidence. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

(b) The evidence supports a finding that Joy Ludlam was bound at her wrists and ankles, gagged, and blindfolded, all against her will. She was therefore confined and detained without legal authority in violation of her personal liberty.[6] Thus, the evidence was sufficient to support the conviction for false imprisonment.

---

[6] OCGA § 16-5-41 (a) (Code Ann. § 26-1308) provides: "A person commits the offense of false imprisonment when, in the violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority."

(c) Warren Tillman, who conducted the original autopsy on the body of Ms. Ludlam, testified that areas of contusion around her vagina and anus were consistent with traumatic entry of these orifices by a male sex organ. Dr. Larry Howard and Dr. Whitaker, who examined the body after it was exhumed, agreed that these areas of contusion indicated traumatic entry and were not merely signs of decomposition. Although no seminal material was discovered in the examination of the body, it was observed that this was not unexpected, considering the lengthy immersion of the body in Scuffle Creek.

The offenses of rape and aggravated sodomy may be proven by circumstantial evidence. *Payne v. State,* 231 Ga. 755 (1) (204 SE2d 128) (1974). See also, *Durham v. State,* 243 Ga. 408 (1) (254 SE2d 359) (1979); *Spraggins v. State,* 240 Ga. 759 (1) (243 SE2d 20) (1978); *Neal v. State,* 152 Ga. App. 395 (1) (263 SE2d 185) (1979). "[W]here the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, the appellate court will not disturb that finding, unless the verdict of guilty is unsupportable as a matter of law." *Harris v. State,* 236 Ga. 242, 245 (223 SE2d 643) (1976).

We conclude that the evidence was sufficient to convince a rational trier of fact beyond a reasonable doubt that appellant accosted the victim for purposes of achieving deviant sexual gratification and that to this end she was bound and gagged, beaten, raped and sodomized. Thus, we find that the convictions for rape and aggravated sodomy are supported by sufficient evidence. Jackson v. Virginia, supra.

Appellant's first and third enumerations of error are meritless.

5. In his eighth and ninth enumerations of error, appellant complains of the denial of his motion to suppress and the admission in evidence of items allegedly seized illegally.

Joy Ludlam's body was discovered on December 8, 1981. Officers involved in the investigation were familiar with the facts of appellant's 1976 crime. The similarities were obvious. The last person known to have seen the victim alive was appellant. On December 9, application was made for warrants for the search of appellant's automobile, home and leather shop.

The affidavits for these search warrants recited that the affiant was a detective with the Warner Robins police department assigned to investigate the disappearance of Joy Ludlam; that her body had been found the previous day in Twiggs County; that she had been murdered; that she had apparently been bound at the hands and feet and gagged with an adhesive substance; that her body was fully clothed except that her underwear had been torn at the crotch; that

she had been sexually assaulted in the vaginal and anal areas; that she had bruises on her breasts; and that her jewelry was missing.

The affidavits further alleged that appellant had admitted to other officers that the victim had visited him at his home and office on the evening of November 24, 1981, and that she had stayed approximately 30 minutes; that affiant had learned from a confidential source that the victim was at his residence for approximately two hours; that affiant had knowledge of a previous offense committed by appellant; that the victim in the prior case had been bound with rope and gagged with tape; that, in the prior case, appellant had committed various sexual acts, including aggravated sodomy; and that the victim's underwear had been ripped, her jewelry removed, and her breasts injured.

The affidavits expressed the affiant's belief that the victim had been alive for approximately 10 days after she was reported missing; that a missing person report was issued for the victim, but that no one had seen the victim during this time, and that appellant was the last person seen with the victim.

The affidavits alleged that the premises to be searched would contain hair, fibers, blood, adhesive and a gold necklace with a "Mickey Mouse" pendant.

Based upon the foregoing, the warrants were issued and the searches conducted.

On December 22, 1981, a warrant was issued to allow the seizure of hair from appellant's person, for comparison purposes.

After Warren Tillman advised investigators that the victim could have been dead for two weeks prior to the discovery of her body, a warrant was issued December 23, 1981, for the search of appellant's home. Additional hairs were discovered, but were not introduced at trial.

On January 18, 1982, another warrant was issued for the search of appellant's home, but officers did not actually enter the house (they searched underneath it). This search did not result in the seizure of any evidence introduced at trial.

On March 10, 1982, officers learned that orange acrylic fibers had been found on the victim's coat. An orange and yellow blanket had been observed, but not seized, during the December 9 search of appellant's home. Three additional warrants were issued, for appellant's home and automobile, and for the home of appellant's parents. Supporting affidavits were similar to previous ones, with the addition of information regarding the fibers and the blanket. The search of the automobile turned up nothing which was introduced at trial. The other two warrants were not executed, because the blanket was discovered during a consent search of the home of appellant's

parents.

On March 29, officers made their final application for a search warrant. The supporting affidavit was similar to previous ones. In addition, affiant, having benefit of the department's purchase of a new, powerful vacuum cleaner, alleged that he wished "to search specifically the bedrooms, washer and dryer, drains and carpets in more detail and using mechanical equipment to gather the hair and fiber." During the search, hairs were recovered from the furnace grate, the dryer lint filter, the dryer vent, and from appellant's bedroom. These hairs were introduced at trial.

(a) Appellant contends that misleading information was given to the issuing magistrate, that material information was withheld from the magistrate, and that the information before the magistrate did not support the issuance of the warrant. We must disagree.

The affidavits are perhaps not perfect. But we find no material inaccuracies or misrepresentations. See *Lee v. State,* 239 Ga. 769 (3) (238 SE2d 852) (1977). Nor do we find the information insufficient to support the issuance of the warrants. "The issuing magistrate is not to be confined by [miserly] limitations or by restrictions on the use of his common sense." United States v. Chester, 537 F2d 173, 175 (5th Cir. 1976). "[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for . . . conclud(ing)' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. [Cits.]" Illinois v. Gates, —— U. S. —— (103 SC 2317, 2331, 76 LE2d 527) (1983). That standard was met in this case.

(b) There is no merit to appellant's contention that the searching officers were not entitled to seize lewd drawings not described in the warrants.

OCGA § 17-5-21 (a) (Code Ann. § 27-303) requires that warrants "particularly describe[ ] the . . . things to be seized . . ." However, OCGA § 17-5-21 (b) (Code Ann. § 27-303) provides that "[w]hen the peace officer is in the process of effecting a lawful search, nothing in [subsection (a)] shall be construed to preclude him from discovering or seizing . . . any item . . . other than the private papers of any person, which is tangible evidence of the commission of a crime."

It is not necessary that items seized under the "plain view" doctrine be contraband. Ibid; Texas v. Brown, —— U. S. —— (103 SC 1535, 1542, 75 LE2d 502) (1983). Nor are items immune from seizure simply because they might be characterized as "private papers." *Mooney v. State,* 243 Ga. 373 (254 SE2d 337) (1979). The drawings were discovered while searches were being legitimately conducted pursuant to warrants, while the officers were within the scope of the

searches authorized, and were items associating appellant with the crime for which he was being investigated. Their seizure was lawful.

(c) The justice of the peace testified at the hearing on appellant's motion to suppress. His practice was to require pre-payment of a fee for applications for arrest warrants by private citizens. This fee was retained by him whether or not the application was granted. Regarding search warrants requested by law enforcement officers, the justice would send the county a bill at the end of each month. He testified that he would not bill the county for warrants that he refused to issue.

Appellant contends that the issuing magistrate was not "neutral and detached," citing Connally v. Georgia, 429 U. S. 245 (97 SC 546, 50 LE2d 444) (1977).

Prior to Connally, justices of the peace in Georgia who were not on salary were authorized to collect a fee if they issued a search or arrest warrant, but not if an application for such was denied. Connally found defective "the Georgia system for the issuance of search warrants by justices of the peace." 429 U. S. at 250.

Georgia law was amended in 1977, in response to Connally, and the present codification of that law provides that justices of the peace are entitled to a fee whether they grant or deny an application for an arrest or search warrant. OCGA § 15-10-14 (Code Ann. § 24-1601). The constitutionality of our present system was upheld in *Allen v. State,* 240 Ga. 567 (242 SE2d 61). (1978).

There is no indication in this record that the county would have violated our law and refused to pay the justice of the peace for warrant applications that he denied. What appellant is essentially contending is that because this justice of the peace chose, on his own, not to bill the county for denied search warrant applications, he is disqualified from issuing search warrants, and that the officers who obtained the search warrants in this case should be penalized for their failure to inquire of the justice of the peace as to his billing habits by excluding from evidence the fruits of their searches. We do not find that to be the law. Cf. *Thompson v. State,* 248 Ga. 343 (285 SE2d 685) (1981).

Appellant's eighth and ninth enumerations of error are meritless.

6. In his seventeenth enumeration of error, appellant contends the trial court erred by refusing to grant his motion for severance.

A prosecutor is required by law to prosecute in a single prosecution all known crimes "arising from the same conduct" that are within the jurisdiction of a single court, subject to the discretion of the court, "in the interest of justice," to order that one or more of the charges be tried separately. OCGA § 16-1-7 (b) (Code Ann. §

26-506) and (c).

Appellant's contention that the trial court abused its discretion by refusing to sever the offenses rests upon the assumption that the 1976 offense was admissible only with regard to the charge of aggravated sodomy and was not admissible to prove the other offenses charged in this case. With this assumption we cannot agree. The prior offense was clearly relevant to prove the identity of Joy Ludlam's murderer.

The different crimes alleged in the indictment were too interwoven and interdependent to permit ready separation of the proof offered in support of each. We find no abuse of discretion in the trial court's refusal to sever. *Gober v. State,* 247 Ga. 652 (1) (278 SE2d 386) (1981).

7. At the close of the evidence, the trial court told the jury "that with respect to the robbery charge," he had formed the opinion "that the state's evidence is insufficient to convict, and would not create a jury issue, and, therefore the matter of whether or not the defendant robbed the victim will not be before you in this case."

The charge of the court was prefaced by this admonition: "As I previously mentioned to you, the robbery charge is no longer before you because as a matter of law such charge was not proved . . ."

Appellant contends in his eighteenth enumeration that these instructions were inadequate. We find that, at least in the absence of any request for additional instruction, the instructions given were sufficient.

8. Prior to trial, two witnesses were hypnotized in an attempt to aid their recall of certain events.

One witness was the assistant manager of the lounge at the Holiday Inn on the evening of November 23, 1981. Without hypnosis, he had recalled seeing appellant at the lounge that evening and he observed appellant engaged in a "casual conversation" with Joy Ludlam. No additional memories of the evening were uncovered by the hypnosis.

The other witness was one of the police officers who talked to appellant on November 25, 1981. The question was whether appellant had admitted to the officer only that Ms. Ludlam had made a telephone call from his residence or whether he had admitted that she had made a telephone call to the Holiday Inn. Appellant's testimony at trial was that she had made a call, but he did not know to whom. The officer testified that appellant had told him that she had called the Holiday Inn.

The court heard the testimony of the officer outside the presence of the jury and found that the officer's "account of the events made prior to hypnosis does not differ in any material respect

from his account during hypnosis . . ."

(a) In his nineteenth enumeration, appellant contends the trial court erred by denying his motion to exclude the two witnesses. We do not agree. Regardless of the admissibility of hypnotically *induced* testimony, the testimony here was consistent with pre-hypnotic statements of the witnesses. The court did not err by allowing the witnesses to testify. *Collier v. State,* 244 Ga. 553 (1) (261 SE2d 364) (1979).

(b) In his twentieth enumeration, appellant contends that the trial court erred by failing to fully and properly instruct the jury on the use and reliability of hypnosis.

The court charged: "If you find that any witness has been placed under hypnosis for the purpose of refreshing or improving that witness' recollection, and if you find that such testimony is in whole or in part induced by the hypnosis, then to the extent that it was you would disregard such testimony."

We do not agree that this charge was incomplete, vague, or confusing, and find no merit to this enumeration of error.

9. As Warren Tillman conducted the autopsy, he dictated his impressions and observations into a tape recorder. He subsequently issued a written report of his findings.

Prior to trial, appellant sought access to this tape recording and any notes made by personnel of the state crime lab. His motion for production of physical evidence was in this respect denied. In his twenty-first enumeration, he contends this denial was error. We disagree.

Appellant was given copies of the autopsy report and of all other written scientific reports. See, *Law v. State,* 251 Ga. 525 (2) (307 SE2d 904) (1983). His expert was able to examine these reports and, as well, the photographs taken during the autopsy and tissue slides from the second examination of the body. Moreover, it is apparent from the testimony of appellant's expert that he had personally discussed the autopsy with Warren Tillman. We do not believe that Tillman's tape-recorded notes amount to "a piece of critical evidence whose nature is subject to varying expert opinion," Barnard v. Henderson, 514 F2d 744, 746 (5th Cir. 1975), or that appellant was denied the means necessary to conduct his defense. *Sabel v. State,* 248 Ga. 10 (6) (282 SE2d 61) (1981). This enumeration of error is without merit.

10. In enumerations of error 22 through 24, appellant complains of the admission in evidence of certain photographs and of the court's refusal to give a requested charge thereon.

(a) Three photographs showed close-up views of incisions made by Dr. Howard for purposes of preparing tissue slides. Appellant contends that these photographs were inadmissible under the rule

announced in *Brown v. State,* 250 Ga. 862 (5) (302 SE2d 347) (1983). We need not answer this contention, however, as this case was tried before *Brown* was decided. We have held that *Brown* has prospective operation only. *Grant v. State,* 251 Ga. 434 (306 SE2d 265) (1983).

We have examined these photographs. They are depicted from such a close perspective that only the incisions and a small portion of the surrounding skin are visible. These photographs illustrated Dr. Howard's testimony and we conclude that their admission was not reversible error. *Ramey v. State,* 250 Ga. 455 (1) (298 SE2d 503) (1983).

(b) Photographs taken of the victim at the scene of the first autopsy were admitted in evidence. These photographs were taken before any incision was made and they were relevant to material issues in the case. The court did not err by allowing their admission in evidence. *Blankenship v. State,* 247 Ga. 590 (8) (277 SE2d 505) (1981).

(c) Also admitted were photographs of the victim's body lying on the bank of Scuffle Creek, which showed the clothes she was wearing, the ripped underwear, the lines of adhesive on her face, scuffed marks on the legs of her hose, and bruises on her neck and arm.

Appellant's request to charge — that the photographs of the body were admitted only for the purpose of showing the injuries inflicted upon the victim and that any portion of the photographs other than such injuries should not cause prejudice against the defendant — was incorrect. The admissibility of the photographs was not so limited, and appellant was not entitled to an instruction that the jury disregard prejudicial portions of the state's case. "Doubtless, photographs of the victim are prejudicial to the accused, but so is most of the state's pertinent testimony." *Blankenship,* supra at 596.

11. In his thirty-first enumeration, appellant contends that testimony by detective Joel Sullivan required a mistrial and that the court's denial of appellant's motion for mistrial was reversible error.

We set forth the pertinent portions of the cross-examination leading up to the answer in question:

"Q [By Mr. Hasty for appellant]: Do you remember any threats being made by your investigators, you or your investigators against Mr. Felker at that particular time?

"A [By detective Sullivan]: No, sir, I don't.

"Q Do you recall telling me down here in the clerk's office that you and 12 investigators started to go over there and kill him at the time you got those pictures back?

"A No, sir, I don't.

"Q You didn't tell me that?

"A No, sir, I don't recall saying that to you.

"Q Down in the clerk's office in this courthouse, Mr. Sullivan?

"A No, sir, I —

"MR. FINLAYSON: Your Honor, I think he's answered that question now three times.

"THE COURT: Yes, sir.

"MR. HASTY: Excuse me just one second, your Honor please.

"Q [By Mr. Hasty]: I'm specifically referring to November 5, 1982, Mr. Sullivan, and I'll ask you if you remember being there in the presence of me and a lawyer from Warner Robins, I think maybe from Perry, I'm not sure, and I cannot remember his name, and having a conversation with us at that time?

"A I remember having one conversation with you out in the hall outside the clerk's office when you asked me if we had anything else on Wayne Felker, and maybe we could work a deal out for a lesser sentence.

"Q I'm asking you —

                    (Laughter in the courtroom.)

"MR. HASTY: Your Honor please, now, that was certainly not responsive to my question —

"THE WITNESS: That's the only conversation I remember.

"MR HASTY: — and I would certainly, I would certainly move for a mistrial in relation to that response.

"THE COURT: Well, I'm going to deny your motion for a mistrial, Mr. Hasty. It was given in response to a question you asked him, although you certainly could argue that it went beyond the response you were seeking.

"I'm going to instruct the jury to disregard the response of the officer in that respect, and not let it bear on your decision in this case."

Appellant contends that since the witness was a law enforcement officer, his statement was a matter of law so prejudicial that a mistrial was required, citing *Boyd v. State,* 146 Ga. App. 359 (2) (246 SE2d 396) (1978). However, in *Sabel,* 250 Ga. at 644, this court rejected the notion that *Boyd* establishes such a per se rule.

Moreover, in view of the testimony as a whole, the answer was not entirely unresponsive. The witness was asked time and again if he remembered a conversation in the clerk's office in which the witness had threatened appellant or had expressed a desire to kill him. Time and again the witness answered that he did not remember any such conversation. Counsel persisted, and finally the witness answered that the only conversation he could remember was one in which

counsel had expressed an interest in working out a deal.

Although one may legitimately complain about illegal testimony which is not responsive to the question, one cannot take chances in propounding questions which may elicit damaging answers, otherwise inadmissible, and then demand a mistrial when such answer is given. *Henderson v. State,* 208 Ga. 73, 75 (65 SE2d 175) (1951).

Reviewing the relevant circumstances, we find that the trial court did not abuse its discretion in denying the motion for mistrial. *Tyler v. State,* 251 Ga. 381 (3) (306 SE2d 263) (1983).

12. In his thirty-second enumeration, appellant contends that the testimony of the 1976 victim should have been excluded because she had been "secreted" from appellant's counsel by the state.

After she was sodomized by appellant in 1976, the victim married and moved out West. She was located by the state and agreed to return to Georgia for the trial of this case.

Prior to trial, the state furnished appellant with a list of witnesses. See OCGA § 17-7-110. (Code Ann. § 27-1403). On the list was the victim's former name as well as her married name.

OCGA § 17-7-110 (Code Ann. § 27-1403) does not require the state to furnish the addresses of witnesses. *Holsey v. State,* 235 Ga. 270 (2) (219 SE2d 374) (1975). Nonetheless, many addresses were ordered to be furnished. However, since appellant had available to him the transcript of the previous trial, the court refused to require the state to furnish appellant with the address of the 1976 victim. The court pointed out that it did not mean to say that this witness would be unavailable for interview by appellant's counsel before she testified.

The witness arrived in Warner Robins more than a week prior to the commencement of trial. Appellant contends that because the state did not inform him of her whereabouts, the witness was unlawfully withheld from him, citing *Wilson v. State,* 93 Ga. App. 229 (91 SE2d 201) (1956).

In *Wilson,* the only eyewitness to the crime was being held in jail as a material witness. The sheriff and the solicitor-general refused to allow the defendant to see the witness. The defendant moved the court for permission to interview the witness, but the motion was denied. This denial was held to be reversible error.

In this case, all that appellant sought was an address, which the state was not compelled to furnish. Although the witness did not testify until the third day of testimony, after a week had been spent selecting a jury, appellant never sought to inquire whether the witness had arrived in Warner Robins, nor did he ever ask the court for an opportunity to interview the witness prior to her testimony.

We conclude that appellant has failed to demonstrate that he was denied access to this witness.[7] *Rutledge v. State,* 245 Ga. 768 (2) (267 SE2d 199) (1980).

13. In enumerations of error 33 through 37, appellant complains of the court's charge.

(a) In enumeration 33, he contends the court erred by refusing to give a request to charge that a defendant's attorney has not only the right, "but the plain duty" to interview any persons who might be able to assist him. He contends that this charge was necessary because the 1976 victim was withheld from him. We do not follow this reasoning, and, in any event, find the requested charge to be more harmful than helpful to appellant, in view of a defendant's right not to testify or present evidence. The court did not err by refusing to give it.

(b) Appellant requested a charge that "a verdict is never demanded in a criminal case in favor of the State where the defendant, in his testimony, denied his guilt." The court refused to give his requested charge. Instead, after defining reasonable doubt, the court charged: "If, after you consider all the facts and circumstances in the case, your minds are wavering, unsettled and unsatisfied, then that is the doubt of the law, and you should acquit the defendant. On the other hand, if such doubt does not exist in your minds as to his guilt, you should convict him."

Appellant correctly observes that a jury has the power to disregard the law and refuse to convict for reasons unrelated to factual guilt. He contends that the jury must be so instructed. We disagree.

"[T]he undisputed power of the jury to acquit, even if its verdict is contrary to the law as given by the judge and contrary to the evidence[,] . . . is a power that must exist as long as we adhere to the general verdict in criminal cases . . ." United States v. Moylan, 417 F2d 1002, 1006 (4th Cir. 1969). However, that "is not to say that the jury should be encouraged in their 'lawlessness.' " Ibid.

The duty of a jury is to be distinguished from its power. Its duty is to apply the law to the facts and to reach a verdict which speaks the truth. *Harris v. State,* 190 Ga. 258 (9 SE2d 183) (1940); *Griffin v. State,* 154 Ga. App. 261 (4) (267 SE2d 867) (1980). If, after

---

[7] We note that appellant had available to him the transcript of the previous testimony of the witness and that he does not now contend that any of her testimony in this case was inconsistent with her previous testimony or that it otherwise surprised him.

considering *all* of the evidence, the jury finds that the state has carried its burden of proving beyond a reasonable doubt every essential allegation in the indictment, and is convinced beyond a reasonable doubt of the defendant's guilt of the crime charged, it should convict. The court's instruction to this effect was not error.

*Salisbury v. State,* 221 Ga. 718 (2) (146 SE2d 776) (1966), relied upon by appellant, is inapposite. The court's charge there, in effect, restricted the jury to a consideration of the state's evidence. Here, the court's instructions clearly required a consideration of *all* of the evidence. *Cape v. State,* 246 Ga. 520 (8) (272 SE2d 487) (1980).

Enumerations 34 and 36 are without merit.

(c) On the credibility of witnesses, the court charged as follows:

"You are the sole judges of the credibility of the witnesses and of the weight to be given their testimony. In deciding the credit to be given any witness' testimony, you may take into account his or her ability and opportunity to observe the facts; his or her memory; the witness' manner while testifying; any interest, bias or prejudice the witness may have, and you may also consider the reasonableness of such testimony.

"If there are conflicts in the evidence, it is your duty under the law to reconcile them wherever possible so as to make all the witnesses speak the truth and not attribute a false statement to any of them. If you cannot do this, however, then you would believe that testimony which is most reasonable and credible to you.

"A witness' testimony may be impeached or discredited by disproving the facts testified to by him or her, or by showing that the witness made a previous statement or statements inconsistent with or contradictory to the testimony given at trial.

"If you determine that the testimony of any witness has been impeached or discredited in that manner, you are authorized to believe or disbelieve said witness' testimony in whole or in part."[8]

In his thirty-fifth enumeration, appellant argues that: "[C]ombining the duty to convict and the duty to make all the witnesses speak the truth was error, because the jury was not thereby given the option of disregarding the testimony of a witness not technically impeached . . . The trial judge instructed the jury to consider all of the testimony as the truth and thereby asked them to construe the testimony so as to remove the reasonable doubt in their

---

[8] The court also gave instructions on hypnotically induced testimony, see Division (8b) ante, and expert testimony. Since these portions of the charge are not complained of here, they are not reproduced above, although they form a part of the court's charge on credibility of witnesses.

minds. Then he instructed the jury to convict if there was no reasonable doubt. In effect, he instructed the jury to convict the appellant." We disagree.

Jurors may not arbitrarily disregard the uncontradicted testimony of credible witnesses. See *Western & Atlantic R. Co. v. Beason,* 112 Ga. 553 (1) (37 SE 863) (1901). Moreover, where there are conflicts in the testimony of witnesses, it is the duty of the jury to reconcile these conflicts if possible so as to make every witness speak the truth. *Cotton v. State,* 81 Ga. App. 753, 755 (59 SE2d 741) (1950). Neither of these rules, however, mean that the jury is obliged to believe testimony which, under the facts and circumstances disclosed, they discredit. *Fincher v. Harlow,* 56 Ga. App. 578, 581 (193 SE 452) (1937). In evaluating the credibility of witnesses, the jury may take into consideration such things as the witnesses' manner of testifying, their means and opportunities of knowing the facts to which they testify, their interest or lack of interest in the case, and the probability or improbability of their testimony. *Harris v. State,* 2 Ga. App. 406, 408 (58 SE 669) (1907).

"The credibility of a witness is a matter to be determined by the jury under proper instruction from the court." OCGA § 24-9-80 (Code Ann. § 38-1805). The charge given accurately stated the law. *Collum v. Georgia R. &c. Co.,* 140 Ga. 573 (6) (79 SE 475) (1913); *Brown v. State,* 10 Ga. App. 50 (2) (72 SE 537) (1911). The court did not, in effect, "instruct the jury to convict the appellant," and this enumeration is meritless.

(d) Appellant requested the court to charge: "[W]hile it is the duty of each juror to discuss and consider the opinions of the other jurors, each juror must decide the case upon his own opinion of the evidence. In deciding the question of reasonable doubt, each juror must decide for himself." The court's refusal to charge this request is alleged as error in enumeration 37.

In *Smith v. State,* 63 Ga. 168 (20) (1879) we held: "The jury are to act as a body, and should be charged as a body. The individual jurors are not to be addressed in the charge in a way to discourage mental harmony and concert. It is not incumbent upon the court to stimulate their individuality by charging, at the prisoner's written request, '[t]hat each juror must be satisfied for himself, from the evidence, of the guilt of the defendant, before he can lawfully agree to a verdict of guilty.' " Id. at 170.

Such a charge is another way of telling a jury that its verdict must be unanimous, and agreed to by each of its members. While trial courts often include in their charge such an instruction, none of the few cases on the subject has ever held such a charge to be mandatory.

In this case, the jury was polled after verdict. Each juror was

asked if the verdict that the jury had just published was his verdict, if it had been arrrived at freely and voluntarily by the juror, and if it remained his verdict. Every juror gave affirmative answers to all three questions. Thus, there can have been no harmful error resulting from the court's failure to give either the requested charge or a charge covering substantially the same principles. *Maddox v. State,* 233 Ga. 874 (2) (213 SE2d 654) (1975).

### Sentence Review

14. In enumerations 25, 26 and 28, appellant contends that the death penalty is cruel and unusual punishment, that Georgia law providing for its imposition is unconstitutional, and that our appellate review is defective. None of these enumerations of error has any merit. See, e.g., Gregg v. Georgia, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); *Mincey v. State,* 251 Ga. 255 (4) (304 SE2d 882) (1983); *Putnam v. State,* 251 Ga. 605 (11) (308 SE2d 145) (1983). We note that appellant's contention that, in conducting our proportionality review, we "compare [ ] death cases only with those cases in which the death penalty has been sought by the state," is incorrect. See *Horton v. State,* 249 Ga. 871, 880 n. 9 (295 SE2d 281) (1982).

15. Appellant's twenty-seventh enumeration, challenging the practice of death-qualification of jurors, is likewise meritless. *Mincey v. State,* supra, (2).

16. In enumeration 29, appellant contends that the trial court erred by charging: "Members of the jury, you are authorized to impose either the death penalty or life imprisonment as to the murder conviction in this case."

Viewed in isolation, this portion of the charge was, at best, incomplete. It is true that the jury had for its consideration two possible punishments with respect to the murder conviction. Appellant would be sentenced on the other convictions by the court. However, this portion of the charge, by itself, did not inform the jury that it would be authorized to impose a death sentence only if it found at least one statutory aggravating circumstance beyond a reasonable doubt. OCGA § 17-10-30 (c) (Code Ann. § 27-2534.1). Nonetheless, other portions of the charge did. In passing upon the merits of this enumeration of error, we do not consider fragments of the charge in isolation. Instead, we must examine the charge as a whole to see whether reasonable jurors were properly informed of the law. *Ranger v. State,* 249 Ga. 315 (7) (290 SE2d 63) (1982); *Brown v. Matthews,* 79 Ga. 1 (4 SE 13) (1887).

The charge, considered as a whole, clearly instructed the jury

that it could not recommend a sentence of death unless it found at least one statutory aggravating circumstance beyond a reasonable doubt. In addition, the jury was informed that even if it found a statutory aggravating circumstance, it could nonetheless refuse to impose a sentence of death. Thus, we find no reversible error in the court's charge. *Conner v. State,* 251 Ga. 113 (4) (303 SE2d 266) (1983).

17. In enumeration 39, appellant contends the trial court erred by instructing the jury that, in considering the sentence to be imposed, the jury could consider evidence presented during the guilt phase of the trial. This enumeration is meritless. *Blankenship v. State,* 251 Ga. 621 (308 SE2d 369) (1983).

18. Appellant was allowed to present the testimony of a political science professor, two professors of religion, and a Presbyterian minister concerning their religious and philosophical objections to the death penalty. Their testimony included a description of the process of electrocution and expressions of opinion that the death penalty is not a deterrent to crime. We have previously held that such testimony is irrelevant to the issues to be decided by the jury in the sentencing phase. *Horton v. State,* supra (5); *Stevens v. State,* 247 Ga. 698 (24) (278 SE2d 398) (1981); *Franklin v. State,* 245 Ga. 141 (7) (263 SE2d 666) (1980).

The political science professor testified that, for a variety of reasons, the death penalty was not an effective deterrent. Then appellant asked about her general attitude toward the death penalty. She answered: "Personally, I'm opposed to capital punishment. I don't think it's an effective deterrent, and that's a judgment that I really make on the basis of study and really I would regard as science; but on a personal level, were someone to ask about my own religious beliefs, you know, I would be opposed." Appellant asked, "In all circumstances?" The witness answered, "In all circumstances. I prefer *life without parole.*" (Emphasis supplied.)

On cross-examination, the state asked the witness if she felt that incarceration was a deterrent. She answered in the negative: "Oh, I see a benefit; oh, certainly, but I don't see a deterrent benefit." She agreed that the death penalty would incapacitate the offender from committing another crime. Then the following transpired:

"Q [By the state]: And I believe you stated that you were unalterably and conscientiously opposed to capital punishment.

"A Right; that's correct.

"Q Under any circumstances?

"A Under any circumstances.

"Q You also said that personally you favored a life sentence without parole?

"A As an alternative, yes.

"Q Well, imagine for a moment that such an animal doesn't exist. Does your situation change?

"A No, basically it wouldn't; it wouldn't."

Appellant moved for a mistrial. He now contends that the court's refusal to grant his motion was error. We disagree.

The personal beliefs of the witness were injected into the case by the defendant, with the consent of the court,[9] including her belief that she preferred life without parole. Appellant cannot now complain that the state cross-examined the witness about these beliefs. *Tucker v. State,* 245 Ga. 68, 72-73 (263 SE2d 109) (1980).[10]

19. Appellant's mother testified on direct examination, at the sentencing phase of the trial, that her son had been sent to prison some time after he was arrested in October 1976, that he had stayed in prison four years, and that he had been released in December of 1980.

In argument, the district attorney stated: "[Felker] received a 12-year sentence and served eight, and I think his mother said that he was released from prison December 19, 1980. That's when he married Patsy, his fifth wife, December 19, 1980. When did this crime occur? November 24, 1981, just about 11 months from the time that he was released from prison."

Appellant contends that the district attorney made an argument concerning parole, in violation of OCGA § 17-8-76 (Code Ann. § 27-2206). We disagree. The argument was very similar to the one made in *Horton v. State,* supra, 249 Ga. at 875-876. It made no reference to parole and was not otherwise improper.

20. The jury found two statutory aggravating circumstances:

---

[9] By way of a motion in limine, appellant successfully sought a pre-trial ruling in his favor on the admissibility of such testimony. The state's objection to the testimony of these witnesses was overruled.

[10] We have not overlooked Tucker v. Francis, 723 F2d 1504 (11th Cir. 1984), in which a panel of the 11th Circuit set aside Tucker's death penalty because among other things, the prosecutor had argued to the jury the possibility of parole in the event of a life sentence.

Our response is that, in addition to the failure to recognize that the necessity for incapacitation is a legitimate area of inquiry in a death penalty case (see Jurek v. Texas, 428 U. S. 262 (96 SC 2950, 49 LE2d 929) (1976)), the panel failed to recognize our holding on direct appeal that any possible error regarding the injection of the possibility of parole was *induced* by the defendant. The panel failed to mention that evidence of a prior parole had been introduced by the defendant, failed to consider the effect of the defendant's failure to interpose any objection to the state's argument, failed to note that the defendant had argued the issue himself, and failed to accord any weight to our procedural resolution of the case, in violation of Wainwright v. Sykes, 433 U. S. 72 (97 SC 2497, 53 LE2d 594) (1977) and Engle v. Isaac, 456 U. S. 107 (102 SC 1558, 71 LE2d 783) (1982).

"(1) That the offense of murder was committed while the offender was engaged in another capital felony, to wit: rape (2) that the offense was outrageously or wantonly vile, horrible, or inhuman, in that it involved torture or depravity of mind." OCGA § 17-10-30 (b) (2) and (b)(7) (Code Ann. § 27-2534.1).

(a) In Division 4c, ante, we held that the evidence was sufficient to support a conviction for rape. The same evidence supports the jury's finding of the § (b)(2) statutory aggravating circumstance.

(b) The evidence shows that Joy Ludlam suffered serious physical and psychological abuse prior to her death. She suffered serious sexual abuse before, and perhaps, also, after her death. Thus, she was clearly "subjected to the unnecessary and wanton infliction of severe physical or mental pain, agony or anguish" and appellant was clearly shown to have committed the murder as the result of his "utterly corrupt, perverted or immoral state of mind." *West v. State,* 252 Ga. 156, 161 (313 SE2d 67) (1984).

The evidence was sufficient to authorize a finding that the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind. *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980). The facts of this case distinguish it from those cases in which a finding of the § (b)(7) statutory aggravating circumstance would not be appropriate. *Whittington v. State,* 252 Ga. 168 (9b) (313 SE2d 73) (1984); *Phillips v. State,* 250 Ga. 336 (6) (297 SE2d 217) (1982).

(c) The jury's finding of statutory aggravating circumstances is supported by the evidence. OCGA § 17-10-35 (c)(2) (Code Ann. § 27-2537).

21. After review of the record in this case, we conclude that the sentence of death was not imposed under the influence of passion, prejudice, or other arbitrary factors. OCGA § 17-10-35 (c)(1) (Code Ann. § 27-2537).

22. The facts of this case are set forth at length elsewhere in the opinion. No further exposition is required here. Suffice to say, the sort of conduct proven in this case has been condemned by death in many other cases. We find that the sentence of death is not excessive or disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c)(3) (Code Ann. § 27-2537).

23. Enumerations of error 30, 38 and 40 are answered by Divisions 18-22 of this opinion.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 15, 1984 —
REHEARING DENIED MARCH 29, 1984.

*Brown, Katz, Flatau & Hasty, S. Phillip Brown, Fred M. Hasty,* for appellant.

*Theron Finlayson, District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr.,* for appellee.

APPENDIX.

*Brown v. State,* 250 Ga. 66 (295 SE2d 727) (1982); *Allen v. State,* 248 Ga. 676 (286 SE2d 3) (1982); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State,* 246 Ga. 598 (272 SE2d 475) (1980); *Gates v. State,* 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State,* 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State,* 243 Ga. 291 (253 SE2d 729) (1979); *Spraggins v. State,* 243 Ga. 73 (252 SE2d 620) (1979); *Davis v. State,* 242 Ga. 901 (252 SE2d 443) (1979); *Johnson v. State,* 242 Ga. 649 (250 SE2d 394) (1978); *Moore v. State,* 240 Ga. 807 (243 SE2d 1) (1978); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976); *McCorquodale v. State,* 233 Ga. 369 (211 SE2d 577) (1974).